PORTLAND FLOURING MILLS CO v. BRITISH & FOREIGN MARINE INS. CO., Limited.

(Circuit Court of Appeals, Ninth Circuit. May 31, 1904.)

No. 998.

1. EVIDENCE—CONTRADICTING WRITTEN CONTRACT—PROOF OF CUSTOM.
Proof of a custom of doing business between the parties is not admissible to contradict or vary the contract made by a bill of lading, which is plain and unambiguous in its terms.

2. SHIPPING—CONTRACT OF AFFREIGHTMENT—LIABILITY FOR FREIGHT.
A provision in a bill of lading that the freight shall be "considered as earned, steamer or goods lost or not lost at any stage of the entire transit," is valid and enforceable.

3. SALE—PASSING OF TITLE—DRAFT ATTACHED TO BILL OF LADING.
Where goods are shipped by a vendor to a vendee, the vendor taking a bill of lading in which he is named both as consignor and consignee, which bill is indorsed in blank and attached to a draft on the vendee

---

¶ 3. See Sales, vol. 43, Cent. Dig. § 547.

for the purchase price, the title to the goods does not pass to the vendee until payment of the draft.

4. SHIPPING—LIABILITY OF CONSIGNOR FOR FREIGHT.

The rule is that the consignor of goods is primarily liable for the payment of the freight, as the party making the contract, regardless of whether or not he is the owner of the goods, or whether the freight is secured by lien.

5. SAME.

Respondent shipped a cargo of flour, consigned to its own order under bills of lading providing that freight should be deemed earned, vessel or cargo lost or not lost. The flour was shipped under contracts of sale, and was insured by respondent in its own name for sufficient to cover the invoice price and freight. Respondent then indorsed the bills of lading and policies in blank, and attached them to drafts drawn on the purchasers for the selling price and cost of insurance, which were forwarded for collection. *Held*, the vessel having been lost, that respondent was liable for the freight, whether its interest in the cargo was that of owner, or whether it merely retained a lien, since in either case the purchasers were to have possession only on payment of the drafts.

6. SAME—DEFENSES.

Where a cargo was insured by the shipper for sufficient to cover its value and the freight, the fact that on the wrecking of the vessel the cargo was surrendered by the master to the insurer without notice to the shipper did not prejudice him, and constituted no defense to an action to collect the freight under the terms of the bills of lading.

Appeal from the District Court of the United States for the District of Oregon.

Appellant is engaged in the manufacture and sale of flour, having its principal office at Portland, Or., and a branch office at Hong Kong, China. It appears that the flour shipped to Hong Kong by appellant is handled by a Chinese syndicate; that the sales made are confined to the company's agent at Hong Kong, through whom the orders are made; that the members of the syndicate receive the flour in certain definite proportions, designated by shares —one firm having three shares, another two, and the third one; that on August 29, 1901, appellant received from its Hong Kong agent a cable confirmation of a contract for an amount of flour to be intended for the members of the syndicate, with a request that the order be confirmed, which was done, according to the shares of each. In December, 1901, appellant shipped with the Portland & Asiatic Steamship Company, for carriage on the Knight Companion, a British vessel operated by said company, a large quantity of flour. One lot, intended for Cornes & Co., was billed to Kobe, Japan, and the others, intended for different purchasers, were billed to Hong Kong, China. The goods in each case were shipped under a bill of lading issued by the carrier, wherein it was stipulated that the flour shipped was to be delivered "at the vessel's tackle unto the Portland Flouring Mills Company, or to his or their assigns. Freight on same as per margin to be collected in U. S. gold coin or its equivalent. The several freight and primages to be considered as earned, steamer or goods lost or not lost at any stage of the entire transit." On the margin of the bills of lading were the letters "N'fy" or "Notify," followed by the name of the firm on whose account the shipment is alleged to have been made. These bills of lading were in each case accepted by appellant, who was therein named both as consignor and consignee. Policies of insurance in the name of appellant were taken out at the invoice price and 40 per cent., which included freight, and drafts drawn at 60 days' sight on the members of the syndicate in the proportion of their shares for the selling price of the flour plus cost of insurance. These policies, one for each member of the syndicate, although in the name of appellant, and the several bills of lading, were indorsed in blank, so that they were available to the holder. The drafts, with the policies and bills of lading, so indorsed, were delivered to Ladd & Tilton, bankers of appellant, and the amount placed to the latter's credit.

The steamship Knight Companion left Portland, Or., on the 31st day of

December, 1901, and reached the coast of Japan, and was there stranded on the 2d day of February, 1902, and abandoned as a total loss by the steamship company and the several insurance companies interested. One of these insurance companies was the appellee, which had insured the steamship company for the freight to be earned by the voyage. Appellee settled with the steamship company, paying its claim in full, and the other insurance companies settled with the holders of their policies, and the insurance companies thereupon divided among themselves certain moneys secured from the salvage of the cargo; the insurers of appellant's shipment receiving 45,205 yen, approximately $22,500. Appellant's insurers paid the face of their policies, which exceeded the selling price of appellant's goods. On the payment of the steamship company's claims in full for freight, appellee became subrogated to the steamship company's rights, and in addition thereto took from the steamship company an assignment of its claim for the freight, and brought this libel in personam for the recovery of the same. The court rendered a decree in favor of appellee (124 Fed. 855), and from that decree the appeal herein is taken.

C. E. S. Wood, S. B. Linthicum, J. C. Flanders, and Williams, Wood & Linthicum, for appellant.

Page, McCutchen & Knight and Snow & McCamant, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement, delivered the opinion of the court.

The contention of appellant is that the bills of lading and the practice between the parties in their previous business relations of a similar character show that the steamship company had always collected from the purchasers of the flour, that the bills of lading constitute a consignment to order, that the person or firm who is to receive the freight at its destination is indicated by the person who is named to be notified, and that the understanding and intention of the parties were, at the time the bill was given, that the freight should be collected from the person receiving the goods. Appellant's counsel in their brief say:

"Our contention is that it was well known by the Portland & Asiatic Steamship Company in this particular case, and by some years of customary traffic between the parties, that the flour was sold to the consignees f. o. b. at Portland, and in making delivery to the steamer and receiving the bill of lading the shipper, so far as all carriage of the goods was concerned, was acting only as the agent and representative of the purchasers' consignees."

The contention of the appellee is that the bills of lading upon their face clearly show that appellant was the owner and consignee, as well as the consignor, of the flour, and that these facts necessarily make it responsible for the freight. We are of opinion that, whatever the customs, usages, and understanding between the parties may have been in their previous transactions, where the goods were delivered and the payment of the freight thereon made by the parties who received the goods, it cannot have any controlling effect in the present case, where the goods were not delivered. The testimony as to the usages and customs in the shipping of the flour was all received subject to the objections urged by appellee as to its sufficiency and relevancy, in this: that each bill of lading constituted a contract between the parties, and could not be impeached or contradicted by parol evidence. The general rule upon this subject is well stated by Story, J., in The Reeside,

2 Sumn. 567, Fed. Cas. No. 11,657 (where numerous authorities upon the point are cited), as follows:

"The true and appropriate office of a usage or custom is to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature and extent of their contracts, arising, not from express stipulations, but from mere implications and presumptions, and acts of a doubtful or equivocal character. It may also be admitted to ascertain the true meaning of a particular word, or of particular words, in a given instrument, when the word or words have various senses, some common, some qualified, and some technical, according to the subject-matter to which they are applied. But I apprehend that it can never be proper to resort to any usage or custom to control or vary the positive stipulations in a written contract, and, a fortiori, not in order to contradict them. An express contract of the parties is always admissible to supersede, or vary, or control a usage or custom; for the latter may always be waived at the will of the parties. But a written and express contract cannot be controlled, or varied, or contradicted by a usage or custom; for that would not only be to admit parol evidence to control, vary, or contradict written contracts, but it would be to allow mere presumptions and implications, properly arising in the absence of any positive expressions of intention, to control, vary, or contradict the most formal and deliberate written declarations of the parties."

In The Delaware, 14 Wall. 579, 603, 20 L. Ed. 779, the court said:

"Such evidence may be introduced to explain what is ambiguous, but it is never admissible to vary or contradict what is plain."

In the present case the intention of the parties was clearly expressed in the bill of lading. There was nothing of an equivocal or ambiguous character contained therein, and there were no words used which required any oral testimony as to their true meaning. In all such cases it is manifest that "the rights of the parties are fixed by the bill of lading, and the evidence of conversations prior to the date of it cannot have any effect to vary its provisions." O'Rourke v 221 Tons of Coal (D. C.) 1 Fed. 619, 624. "The carrying contract, reduced to writing in a bill of lading, can no more be altered or varied by parol evidence than any other written contract." The Golden Rule (C. C.) 9 Fed. 334. "Such a contract is to be construed, like all other written contracts, according to the legal import of its terms. It becomes the sole evidence of the undertaking, and all outstanding agreements are extinguished by the writing." Louisville, E. & St. L. R. Co. v. Wilson (Ind. Sup.) 21 N. E. 343, 4 L. R. A. 244. See, also, Galveston, etc., R. Co. v. Silegman (Tex. Civ. App.) 23 S. W. 299.

The contract as made between the parties is a valid one, that can be enforced. It is true, as claimed by appellant, that, where there is no specific agreement to the contrary, freight is not deemed earned until the voyage is completed, and the goods are delivered or ready to be delivered at the point of destination. But this principle has no application whatever to a case like the present, where it is expressly provided:

"The several freight and primages to be considered as earned, steamer or goods lost or not lost at any stage of the entire transit."

The true rule in regard to contracts of this character was thus expressed by Lord Ellenborough, C. J., in 1815, in De Silvale v. Kendall, 4 M. & S. 37, 42:

"By the policy of the law of England freight and wages, strictly so called, do not become due until the voyage has been performed. But it is competent

to the parties to a charter party to covenant by express stipulations in such manner as to control the general operation of law. The question in this case is whether the parties have not so covenanted by the stipulations of this charter party. If the charter party be silent, the law will demand a performance of the voyage; for no freight can be due until the voyage be completed. But if the parties have chosen to stipulate by express words, or by words not express, but sufficiently intelligible to that end, that a part of the freight (using the word 'freight') should be paid by anticipation, which should not depend upon the performance of the voyage, may they not so stipulate? * * * And there can be no doubt that the payment of freight may by the agreement of the parties be so exempted."

In 7 Am. & Eng. Enc. of Law, 246, it is said:

"It is competent for the parties to a contract of affreightment to stipulate expressly that the freight, or a part thereof, shall be payable absolutely at the time of the shipment of the cargo, or at a certain time thereafter, without regard to performance of the contract."

It is argued by appellant that there is no explanation of the words of the bill of lading, "Freight to be collected in U. S. gold coin or its equivalent, payable at Hong Kong, China," and "Notify Wing Chong Lee," that is consistent with the language of the bill of lading, except that the carrier had agreed to collect its freight from Wing Chong Lee at Hong Kong. But the record shows that appellant transacted business at Hong Kong, as well as at Portland, and this may have been the reason for inserting the provision as to the place of payment of freight. We do not, however, consider it important to ascertain the reasons why such stipulations were embodied in the contract. It is enough to say that the contract as made is valid and of binding force. The fact that appellant's vendee was named in the respective bills of lading, in connection with the letters "N'fy" or "Notify," does not change the meaning and intent of the contract made by the parties that appellant should pay to the steamship company the amount of freight agreed upon.

We are of opinion that appellant, at the time the bill of lading was executed, must be considered as the owner as well as the shipper of the flour, upon the familiar and well-settled principle of law that, where goods are shipped by a vendor to a vendee, the vendor taking a bill of lading in which the vendor is named both as consignor and consignee, which bill of lading is indorsed in blank and attached to a draft for the purchase price drawn on the vendee, the title to the goods remains in the vendor, and the vendee does not become the owner of the same until the payment of the draft. Dows v. National Exchange Bank, 91 U. S. 618, 630, 23 L. Ed. 214; Seeligson v. Philbrick (C. C.) 30 Fed. 600; Ramish v. Kirschbraun, 107 Cal. 659, 661, 40 Pac. 1045; Stollenwerck v. Thacher, 115 Mass. 224, 226; Erwin v. Harris, 87 Ga 336, 13 S. E. 513.

The question of ownership may be considered immaterial, under the facts of this case. The rule is that the consignor is the party primarily liable for the payment of the freight, and this rule is enforced, independent of the question whether the consignor is the owner, and regardless of the question whether the payment of freight is secured by a lien on the cargo, because the consignor is the party for whom the

service is performed. This rule is applied to clauses, often found in bills of lading, "he or they paying freight," or "he, the consignee, paying freight." In Wooster v. Tarr, 8 Allen, 270, 85 Am. Dec. 707, Bigelow, C. J., in delivering the opinion of the court, said:

"The question raised in this case is very fully discussed in Blanchard v. Page, 8 Gray, 281, 286, 290–295. It is there stated to be the settled doctrine that a bill of lading is a written simple contract between a shipper of goods and the shipowner; the latter to carry the goods, and the former to pay the stipulated compensation when the service is performed. Of the correctness of this statement there can be no doubt. The shipper or consignor, whether the owner of the goods shipped or not, is the party with whom the owner or master enters into the contract of affreightment. It is he that makes the bailment of the goods to be carried, and, as the bailor, he is liable for the compensation to be paid therefor. The dictum of Bayley, J., in Moorson v. Kymer, 2 M. & S. 318, subsequently repeated by Lord Tenterden in Drew v. Bird, Mood. & Malk. 156, that, in the absence of an express contract by the shipper to pay freight, when the goods are by the bill of lading to be delivered on payment of freight by the consignee, no recourse can be had for the price of the carriage to the shipper, has been distinctly repudiated, and cannot be regarded as a correct statement of the law. Sanders v. Van Zeller, 4 Q. B. 260, 284; Maclachlan on Shipping, 426. * * * A master is not bound at his peril to enforce payment of freight from the consignees. The usual clause in bills of lading, that the cargo is to be delivered to the person named or his assignees, 'he or they paying freight,' is only inserted as a recognition or assertion of the right of the master to retain the goods carried until his lien is satisfied by payment of the freight; but it imposes no obligation on him to insist on payment before delivery of the cargo. If he sees fit to waive his right of lien, and to deliver the goods without payment of the freight, his right to resort to the shipper for compensation still remains. Shepard v. De Bernales, 13 East, 565; Domett v. Beckford, 5 B. & Ad. 521, 525; Christy v. Row, 1 Taunt. 300. Although the receipt of the cargo under a bill of lading in the usual form is evidence from which a contract to pay the freight money to the master or owner may be inferred, this is only a cumulative or additional remedy, which does not take away or impair the right to resort to the shipper on the original contract of bailment for the compensation due for the carriage of the goods."

See, also, 7 Am & Eng. Enc. of Law, 276, and authorities there cited

In the light of all the facts in the present case, we are of opinion that there was no obligation on the part of the carrier to notify the shipper of the goods of the loss of the ship, and no penalty to be incurred by the carrier for failure so to notify. The carrier cannot be deprived of its right to collect freight unless the vessel was lost by the carrier's negligence, and there is no evidence in the record that the steamer was lost by any negligence on the part of the carrier. Negligence on the part of a carrier cannot be presumed. It must be proved by the party alleging it.

The gist of the whole case was briefly, but clearly and pointedly, expressed by the court below, to the effect that the president of appellant testified that the flour stood as security for the drafts. Whether its interest was that of ownership or lien, the parties for whom the flour was intended were to have it when paid for, and not before. "In whatever light the transaction is viewed, this is what it comes to." The consignment in the bills of lading to appellant's order, and the insurance in its name, were to this end; and the conclusion is unavoidable that appellant was the shipper, and to it the carrier's service, whether

for receiving the freight and agreeing to carry it, or for in fact carrying it, was rendered, and, as the case stands, the appellant is responsible for the freight agreed to be paid.

The decree of the District Court is affirmed, with costs.