PORTLAND FLOURING MILLS CO. v. PORTLAND & ASIATIC S. S. CO. et al.

(District Court, D. Oregon. December 16, 1907.)

No. 4,800.

INSURANCE—SHIPPING—LIEN FOR FREIGHT—EFFECT OF SALVING OF CARGO OF STRANDED VESSEL BY INSURER.

Where a portion of the cargo of a stranded vessel was salved by strangers, under directions, however, of an agent of the insurer which had written a valued policy on the cargo, and with the consent of the agent of the vessel owners, while the master stood by and gave advice, but exercised no control, the operation was equivalent to an abandonment to the insurer as effecting a surrender of the vessel's lien for freight which could not thereafter be resumed as to the salved cargo or its proceeds.

In Admiralty. On exceptions to amended libel.

Exceptions to the original libel were sustained by the court for the reasons stated in the opinion rendered. See 145 Fed. 687. The changes attending the present libel as compared with the original are, in substance, as follows: The allegation that the vessel, together with her cargo, was immediately abandoned by her master and crew without any necessity therefor, and without any attempt at salvage of cargo or any part thereof, or any notification to libelant, and the steamship was abandoned to the underwriters of the vessel as a total loss, is omitted from the amended libel. By the original libel it is alleged that the salvage of cargo was immediately begun by Japanese fishermen on or about February 6, 1902, and that one Rennie Tipple, the surveyor to Lloyd's agent and local underwriters, took charge of salvage operations, while in the amended libel it is set forth that Tipple, "the surveyor to Lloyd's and as agent of local underwriters, including this respondent Commercial Union Assurance Company, and as agent for respondent Portland & Asiatic Steamship Company, took charge," etc. And it is further set out, by the latter clause of paragraph 10, that the work of directing the salvage was undertaken by Tipple under instructions from the underwriters of the cargo, and by consent of and as agent for Samuel Samuel & Co., Japanese agent for respondent steamship company. It is further shown by paragraph 11 that the salved flour was sold, under authority of a meeting of local agents to underwriters, "including this respondent, and also by consent and authority of this respondent, said steamship company," and the proceeds were deposited to the joint credit of Samuel Samuel & Co., who were the Japanese agents of respondent steamship company, and H. R. Playfair, who was the Japanese agent of respondent assurance company, "as trustees for whom it might concern"; the quotations showing the new matter added. It is then further alleged, under paragraph 13, in effect, that the price for which the salved flour was sold was increased by the amount of the freight, thus adding to its value by that much, which freight, as between libelant and assurance company, libelant was not liable to pay, and ought not, in equity and good conscience, to be compelled to pay; that the Chinese syndicate has been dissolved by the death of some of its members, and that the surviving members are wholly bankrupt; that the assurance company has acted with full knowledge and notice of the claim of libelant; that though the respondent steamship company, by its local agents in

Japan, Samuel Samuel & Co., did not actively participate in the salvage or sale of said flour, said flour was salved and sold, and the proceeds thereof deposited in bank, with the consent and co-operation of said Samuel Samuel & Co. as agent of the steamship company, and for the joint account of said Samuel Samuel & Co. and the underwriters of the cargo, for the benefit of whom it might concern as events should transpire; that the steamship company did not, in fact, release its lien on said flour, or on said fund, for the freight, but reserved said lien subject to payment by and for the benefit of libelant, and that, when said money was paid over to respondent assurance company, it executed to Samuel Samuel & Co., as such agents, a bond conditioned that it should take the place of said fund as between the steamship company and the assurance company, and that the latter company should hold the former harmless by reason of the surrender of such fund.

Williams, Wood & Linthicum, for libelant.

W. W. Cotton and James G. Wilson for Portland & Asiatic Steamship Company.

Snow & McCamant, for Commercial Union Assurance Company.

WOLVERTON, District Judge (after stating the facts as above). With the changes as indicated by the above statement, it does not yet seem to me that the amended libel states a good or sufficient cause for the relief demanded. Libelant's theory of the cause, as was stated in the previous opinion, is that it, the flouring mills company, was surety for the Chinamen for the payment of freight to the steamship company, which relation was well known to both the respondents; that the steamship company had a shipowner's lien on the cargo of flour by way of security for the payment of such freight; that the lien not only existed on the cargo while aboard ship in its original state, but that it was not released, but attended such cargo in its salved condition, and attached to the fund arising from a disposal thereof, and that, by subrogation to the rights of the steamship company, libelant is entitled to the benefit of that lien for its reimbursement in paying the freight money under compulsion from the court. If the steamship company possessed a shipowner's lien on the flour at the time the freight was paid by the libelant, and libelant was in reality but a surety for the Chinamen, and not the principal obligor for the payment of the freight, and the steamship company was aware of the true situation, I assume that the subrogation would follow, so that the libelant would come into the rights of the steamship company as it respects the lien, and would be entitled to enforce it. And this would be so as against the assurance company, respondent, if it came into possession of the flour and the fund with full knowledge, as it is alleged, of the conditions attending the lien, as its rights, whatever they might be, would be subordinated thereto. It is hardly necessary to reiterate that this is not a matter disposed of in the case of Portland Flouring Mills Company v. British & Foreign Marine Ins. Co., 130 Fed. 860, 65 C. C. A. 344, as this is a controversy between the principal and the surety, while that was a litigation, in its legal effect, between the obligee and the principal, and the shipper was, in pursuance of settled law, not allowed to show that he was, as against the obligee, but a surety, contrary to the plain reading of the bill of lading. As between joint obligors upon a paper, or as between the principal and surety, the true relation of the parties can ordinarily be shown, notwithstand-

ing their apparent relation as indicated by the writing. Not so when the controversy is between the obligee and the obligors. There the writing itself is conclusive of the legal relation, and nothing to the contrary will be permitted to be shown. So I take it that the former case does not conclude the libelant in the theory by which counsel now brings the cause upon the record.

It is strongly presented that the amended libel is utterly inconsistent with the original, and with the position taken by libelant throughout the trial of the British & Foreign Marine Insurance Company Case. But, whether that be true or not, this pleading should be determined upon its own merits, without reference to other papers or proofs filed or given in this or other cause. By the former opinion it was determined that when the steamship company abandoned the cargo to the underwriters, as it was alleged by the original libel that it did, it thereby waived or lost its lien on the flour as security for the payment of freight. The question now arises whether or not there was yet an abandonment of the cargo on the part of the steamship company, as shown by the amended libel. If there was, unless it was conditional or with some reservation of the lien, then the lien was lost to the ship, and could not again be resumed. Whether the steamship company released or reserved the lien for freight, its right to recover the freight from the shipper was not impaired; the lien being a protection for its sole benefit. And it is only in the event that the lien still attached when the freight was paid to it by the surety that the surety would be subrogated to its right to enforce the lien against the thing, or that which represents the thing—the fund arising from a sale of the salved flour. The delivery of the cargo to the consignee without reserving in any way the lien which the law imposes, or was reserved by the bill of lading, would be deemed a waiver of such lien. 4,885 Bags of Linseed, 1 Black, 108, 17 L. Ed. 35. The like result would ensue from any relinquishment of possession without in some way reserving the lien, so that constructively the possession would still remain with the ship; for when, as I have shown, possession is lost unconditionally, or what is tantamount thereto, the lien is lost also. The ship was "grounded and stranded," and supposedly proceeded no further. Then, pursuing the averments of the libel, it appears that salvage of the cargo was begun by Japanese fishermen, and that thereupon Rennie Tipple, as agent of the underwriters, took charge of the salvage operations, in which operations the master of the vessel exercised no control, but for a time stood by personally and gave advice, and that Samuel Samuel & Co., local agents of the steamship company in Japan, did not actively participate in the salvage or sale of the flour, but that the proceeds thereof were deposited to the joint account of said Samuel Samuel & Co., as such agents, and the underwriters of the cargo, for the benefit of whom it might concern as events should transpire. Thus it is shown that there was a wreck of the vessel, and a part of the cargo was salved; but by whom, and for whose benefit? The ship did not salve it, and took no part in the salvage operations, except that the master stood by and gave advice. Nor does it appear that the master, or any one in authority as to the ship, gave further or any directions touching the salved flour. There was no attempt on the part of

the ship to carry the flour on to destination, or to procure it to be so carried. Nor was there any declaration of purpose to retain posses-, sion with a view of preserving the lien for freight. Because of the stranding of the ship, the entire cargo would doubtless have been lost had it not been for the work of salving. The Japanese fishermen, people supposedly wholly disconnected in interest or by employment with the vessel, began the work; and Tipple, as agent of the local underwriters, took charge of the operations. A part of the flour was accordingly salved. Without more, it would naturally follow that the flour was salved for the underwriters; and this is what happened, I think, when all the averments of the libel are considered together, even by the rule of liberal construction. I am not saying whether the rule applies, but am conceding the benefit thereof to libelant, that the matter may be put beyond dispute. The master of the ship having stood by personally and given advice, while exercising no control in the premises, it could not be taken to mean that the ship retained any authority whatever over the salved flour. But by averment it is said that Tipple took charge of the salving operations as agent for the steamship company, as well as agent for the local underwriters. A little later, however, and in the same paragraph (10), it is said that the work of directing the salving operations was undertaken by Tipple under instructions from the underwriters, and by consent of and as agent for Samuel Samuel & Co., Japanese agents of the steamship company; so that it appears now that it was simply by the consent of Samuel Samuel & Co., who were the Japanese agents for the steamship company, that Tipple took charge of the salvage operations. But still further on in the libel (paragraph 13) it is averred that though the steamship company by its local agents, Samuel Samuel & Co., did not actually participate in the salvage or sale of the flour, said flour was salved and sold, and the proceeds deposited to the joint account of Samuel Samuel & Co., as agents of the steamship company and the underwriters of the cargo, for the benefit of whom it might concern. This averment puts it beyond controversy that the part that Samuel Samuel & Co., took in salving the flour was nothing more than to give their consent that it might be salved by the underwriters. The underwriters could have had but one purpose in salving the flour, which was to reimburse them for the loss they should sustain under their insurance. It is conceded that the policy written by the respondent assurance company upon the cargo was what is known in marine insurance as a valued policy, subjecting the insurers to the payment of the entire sum when loss occurs and the goods are abandoned to the underwriters. So that upon the whole, the flour was salved by the underwriters, with the consent of the local agents in Japan for the steamship company, which is simply to say that the steamship company consented to the underwriters' thus possessing themselves of the flour for the purpose of their reimbursement for insurance written thereon, which was tantamount to an abandonment of the flour to such underwriters by the ship, or the steamship company which controlled it, by reason whereof the lien for freight was lost. This brings the case within the decision upon the original libel, and the amended libel is

therefore also insufficient. That the proceeds of the salved flour were deposited to the joint account of Samuel Samuel & Co. and the underwriters does not change the result. Such deposit was for the benefit of whom it might concern, and the underwriters, under the conditions prevailing, were the sole beneficiaries, as the fund was afterwards so treated. The abandonment of the flour by the ship to salvage by the underwriters was a relinquishment of possession, and a consequent waiver of the lien for freight. Henceforth the ship could have no more concern with the salved flour or the fund arising therefrom, and the lien for freight therefore never attached to, nor does it now incumber, the fund in the hand of the respondent assurance company. That the flour was enhanced in value by reason of the transportation to the Orient can make no difference in the application of the principles discussed; nor do I conceive that any trust relations existed except such as in a manner might have arisen through the lien for freight that attached in the first instance. But, this lien being solely for its benefit, the carrier could, as has been stated, abandon or relinquish it at any time without impairing its right in the least to a recovery of the freight money. An abandonment or relinquishment by the ship or its owners of the shipowner's lien is what happened; and hence there can be no subrogation.

The exception to the libel on the merits will be sustained.