### GEORGE F. HINRICHS, Inc., v. STANDARD TRUST & SAVINGS BANK.

(Circuit Court of Appeals, Second Circuit. January 18, 1922.)

#### No. 39.

1. Carriers ⬤⟳58—Factor consignee in straight bill of lading with draft attached, to whom shipment delivered without presentation, held to have no right to sell and apply proceeds after notice of transfer.

Where consignor in straight bill of lading for interstate shipment obtained loan on security of shipment, and delivered to bank its draft drawn on factor consignee for the amount of the loan, the legal title to the bill of lading passed to the bank, and though the carrier properly delivered the shipment to the consignee without presentation of the bill of lading, such consignee, after it had notice that the bill of lading and draft accompanying it had been transferred to the bank, had no right to make a sale and apply the proceeds on the indebtedness due it by the consignor without paying the draft, under Act Cong. Aug. 29, 1916, c. 415, §§ 2, 3, 29, and 32 (Comp. St. §§ 8604aaaa, 8604b, 8604o, 8604pp).

2. Carriers ⬤⟳58—Presentation of bill of lading with draft attached sufficient notice of rights of holder.

Where straight bill of lading of interstate shipment and draft were discounted with a bank, presentation to factor consignee of the draft with bill of lading attached was sufficient notice to the consignee of the rights of the bank to be paid out of a sale of the shipment, under Act Cong. August 29, 1916, c. 415, §§ 2, 3, 29, 32 (Comp. St. §§ 8604aaaa, 8604b, 8604o, 8604pp).

In Error to the District Court of the United States for the Southern District of New York.

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action by the Standard Trust & Savings Bank against George F. Hinrichs, Inc.   Judgment for plaintiff, and defendant brings error. Affirmed.

Certiorari denied 257 U. S. ——, 42 Sup. Ct. 462, 66 L. Ed. ——.

The plaintiff in error was defendant below and is hereinafter referred to as defendant.   The defendant in error, the plaintiff below, is hereinafter referred to as plaintiff.   The plaintiff is a corporation organized under the laws of the state of Illinois, and conducts its business at the city of Chicago therein.   The defendant is a corporation organized under the laws of the state of New York, and is engaged in business in the city of New York.

The complaint alleges:   That on or about January 20, 1920, the firm of Grant Bros. & Co. delivered to the Michigan Central Railroad Company at Chicago 468 cases of eggs consigned to the defendant at the city of New York, and received from the United States Railroad Administration, then operating the Michigan Central Railroad Company, its straight bill of lading for the eggs consigned.   That thereafter and on January 22, 1920, Grant Bros. Company applied to plaintiff at its office in Chicago for a loan of money on the security of the eggs so consigned, and delivered to the plaintiff its draft, drawn on defendant and directing the latter to pay to the order of the plaintiff the sum of $8,424.   That attached to the draft and referred to therein were the invoice of Grant Bros. & Co. to the defendant for the eggs at the price of $8,424, and also the bill of lading above referred to.   That thereupon the plaintiff paid to Grant Bros. & Co. the sum of $8,424.   That thereafter plaintiff indorsed the draft to the order of the Chase National Bank in New York, and forwarded the draft so indorsed to that bank, with the invoice and bill of lading attached, for presentation to and payment by the defendant.   That on January 26, 1920, the Chase National Bank presented the draft, with the invoice and bill of lading attached, to the defendant at New York, and gave notice to defendant that the plaintiff was the owner of a special property in the eggs and the proceeds thereof in the sum of $8,424.   That the defendant, notwithstanding the presentation of the draft and the aforesaid notice, sold the eggs and received the proceeds of the sale, and wrongfully applied the same to its own use, and refused to pay the same, or any part thereof, to the plaintiff.   And judgment was demanded in the sum of $8,424, with interest from January 22, 1920.

The evidence at the trial showed that the eggs arrived in New York on January 28th, and on that day and January 31st the railroad company delivered them to the defendant without the production of any documents.   At that time Grant Bros. & Co. was indebted to defendant in the sum of $2,500.   The defendant sold the eggs between February 4th and February 11th, and credited the proceeds to the account of Grant Bros.   With this credit a balance of $5,303.84 was created in favor of Grant Bros., which was paid to that company by defendant's checks dated on February 14 and February 24, 1920.   The evidence disclosed that on January 24, 1920, the draft had been presented to the president of the defendant by the Chase National Bank, and payment was refused by him and the draft handed back to the bank's messenger, who had presented it.   It may be noted that the indebtedness of Grant Bros. to the defendant was incurred after the plaintiff's advance, and after the arrival of the eggs in New York.   Grant Bros. subsequently became bankrupt.

At the end of the plaintiff's case the defendant moved to dismiss the complaint. on the ground that the plaintiff had failed to prove facts sufficient to constitute a cause of action, upon the ground that the testimony showed that the eggs were shipped to the defendant upon a straight bill of lading, and that the bank could not acquire any enforceable lien upon or interest in or title to the eggs, upon the further ground that the bank failed to take any of the precautions which were open to it for the purpose of securing its money if the loan was made upon collateral, and lastly upon the ground that, if any liability existed on the part of the defendant at all, it was secondary; that is, that the bank made a loan originally to Grant Bros. & Co., and that there was no evidence in the case that Grant Bros. & Co., had not paid the

**loan**; that there was no evidence of any effort on the part of the bank to enforce the claim against Grant Bros. & Co. The motion was denied. The motion was renewed at the close of the whole case, and again denied. The defendant then asked leave to go to the jury on the issues raised by the pleadings, and the issue as to whether or not the defendant had any notice that the bank had made an advance upon this property, and on the issue as to whether or not the bank actually did make an advance upon the car load of eggs in question as collateral, and upon all the questions raised by the evidence and by the pleadings. The plaintiff asked for the direction of a verdict for the plaintiff. The defendant's request to be permitted to go to the jury was denied, and a verdict was directed for the plaintiff.

Bouvier & Beale, of New York City (B. F. Norris, of New York City, of counsel), for plaintiff in error.

Spencer, Ordway & Wierum, of New York City (Otto C. Wierum, of New York City, of counsel), for defendant in error.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). It appears that Grant Bros. & Co. was, in January, 1920, wholesale dealers in butter, eggs and poultry in Chicago, and did its banking business with the Standard Trust & Savings Bank in that city—the plaintiff in this action. Grant Bros. shipped a carload of eggs by rail, consigned to the defendant at New York, taking a straight bill of lading therefor. Thereupon Grant Bros. obtained from the plaintiff a sight draft, payable to its order and drawn on defendant, in the sum of $8,424, to which the bill of lading and invoice was attached. The bill of lading named the defendant as consignee. The plaintiff credited the account of Grant Bros. with the amount of the draft, and forwarded it with the bill of lading and the invoice to its correspondent in New York for presentation to defendant, and payment was refused. The defendant sold the eggs on their arrival in New York, paid themselves out of the proceeds a debt due to them from Grant Bros., and remitted the balance to the latter.

The plaintiff brought this action on the theory that it acquired title to the eggs when it took the bill of lading from Grant Bros. and advanced to the latter $8,424, and that defendant acquired no right in the eggs and could not sell them, having declined to pay the draft drawn on it. The defendant claims that, as the bill of lading was a "straight" bill of lading, and not an "order" bill of lading, the title to the eggs was in it as consignee, and that it had the right to pursue the course it took. The defendant says that, having sold the eggs and paid the proceeds over to Grant Bros., it ought not now to be required to pay the plaintiff, as it would be paying for the eggs twice over. This is, of course, no answer. If defendant with notice paid the money to one not entitled to receive it, it may be compelled now to pay to the rightful owner what it wrongfully paid to another.

The Act of August 29, 1916, known as the Bills of Lading Act (Comp. St. §§ 8604aaa–8604w), applies, as the shipment was in interstate commerce. 39 Stat. p. 538, c. 415. Section 2 of the act provides that a bill in which it is stated that the goods are consigned or destined to a specified person is a straight bill; and section 3 provides that a

bill in which it is stated that the goods are consigned or destined to the order of any person named in such bill is an order bill. The bill of lading issued to the shipper in the transaction herein involved stated that the goods were "consigned to Geo. F. Hinrichs & Co.," and their destination was New York. It was therefore a straight bill of lading.

The act also provides in section 3 that any provision in an order bill that it is nonnegotiable shall be null and void, and shall not affect its negotiability, unless upon its face and in writing it is agreed to by the shipper; and section 6 provides that a straight bill shall have placed plainly upon its face by the carrier issuing it "nonnegotiable" or "not negotiable." The evident intention of the act is to make straight bills nonnegotiable and order bills negotiable; and subsequent sections of the act provide how order bills may be negotiated and as to the rights acquired under a negotiated order bill. We need not concern ourselves with such provisions as the bill here in question is not an order bill.

Section 29 of the act provides as follows:

"That a bill may be transferred by the holder by delivery, accompanied with an agreement, express or implied, to transfer the title to the bill or to the goods represented thereby. A straight bill cannot be negotiated free from existing equities, and the indorsement of such a bill gives the transferee no additional right."

And section 32 provides in part as follows:

"That a person to whom a bill has been transferred, but not negotiated, acquires thereby as against the transferor the title to the goods, subject to the terms of any agreement with the transferor. If the bill is a straight bill such person also acquires the right to notify the carrier of the transfer to him of such bill and thereby to become the direct obligee of whatever obligations the carrier owed to the transferor of the bill immediately before the notification. * * *"

It appears, then, that the carrier delivered to Grant Bros. a straight bill of lading, which was nonnegotiable, and that Grant Bros. transferred it to the plaintiff, and that under the act of Congress the plaintiff acquired such right in the goods as Grant Bros. had, subject to existing equities, with a right to notify the carrier of the transfer to the plaintiff made by the original holder of the bill, and thereby to become the direct obligee of whatever obligation the carrier owed to the transferor of the bill immediately before the notification. But in this case no notification was given to the carrier, and it delivered the eggs to the defendant, as it was entitled to do under the terms of the shipment.

[1] The question thus presented is as to the right of the defendant, who was a factor consignee, to make the sale after it had notice that the bill of lading and a draft accompanying it had been transferred previously to the plaintiff. The evidence shows that Grant Bros., as owners of the eggs, shipped them to the defendant at New York to sell on commission; that the plaintiff acquired title to the bill of lading and accompanying draft from the shippers on January 22, 1920; that the draft was presented to the defendant on January 26th, who refused to pay it; that defendant received the eggs on January 28th, and sold them on February 4th and 11th, which was after it had knowledge of the draft.

279F.—25

According to the settled principles of commercial law, which in this respect is not changed by the Bill of Lading Act, the consignee named in the bill of lading issued to Grant Bros. was constituted their authorized agent to receive the goods, and no person but such consignee could by an indorsement of the straight bill of lading pass the legal title to the goods. But as the shipper was in this case the owner of the goods, and the shipment was on his own account, while he could not pass the title by a transfer of the bill of lading, not being named therein as consignee, yet he could pass the legal title to the bill of lading, and it would be good, not only as against his agents and factors, but as against his creditors. See Conard v. Atlantic Insurance Co., 1 Pet. 386, 445, 7 L. Ed. 189.

By mercantile law a bill of lading is a symbolic representation of the goods therein described. Shaw v. Railroad Co., 101 U. S. 557, 25 L. Ed. 892; Michigan Central R. Co. v. Phillips, 60 Ill. 190; Brown v. Foersheim Mercantile Co., 206 Mass. 373, 92 N. E. 494. As it is said in Shaw v. Railroad Co., supra, 101 U. S. 565, 25 L. Ed. 892:

"Bills of lading are regarded as so much cotton, grain, iron, or other articles of merchandise. The merchandise is very often sold or pledged by the transfer of the bills which cover it."

Where A, the shipper, takes a bill of lading and names himself as consignee, he retains title to the goods. If he names B. as consignee, the title to the goods is in B. But in both cases he has an effective hold upon the goods, for in the latter case he has a right of possession analogous to a lien, which he can exercise prior to the actual delivery of the goods to B. by the carrier. See Williston on Sales, p. 436. In the instant case the shipper, Grant Bros., transferred the straight bill of lading to the Standard Trust & Savings Bank. By that transfer the latter, under section 29 of the act, took it subject to the "existing equities," and also under section 32 acquired the right to notify the carrier of the fact of the transfer; but this right it failed to exercise, and actual delivery of the goods by the carrier was therefore rightfully made to the consignee. No question is made by any one but that the carrier was entitled to do what it did under the circumstances.

But the vital question is as to the right of the Standard Trust & Savings Bank, which acquired the straight bill of lading from the shippers by having discounted it. It must be plain that the bank took the rights of the shippers "subject to equities." It did not acquire the legal title to the eggs. That title, as the bill on its face showed, was in the consignee, George F. Hinrichs, Inc., the defendant. The bill of lading did not, however, disclose whether the title of the consignee was merely nominal, or whether it was absolute; whether the defendant had a merely naked legal title, or whether its title was legal and equitable. The evidence shows that the consignee was in fact the holder of a merely naked title, the eggs having been consigned to it to sell for the consignor, the beneficial or equitable title being in the latter. Had the defendant consignee sold the eggs and paid the proceeds realized from the sale over to the consignor, all without notice that the latter had parted with its interests in the consignment, we suppose it would be conceded that the transferee of the bill of lading, who took it "subject

to equities," would not think it had any right to complain as against the consignee defendant. On the other hand, if the consignee, after having notice that the consignor had parted with its interest and transferred its rights to the bank, thereafter sold the eggs and paid the proceeds over to the consignor, it is equally plain that the liability of the consignee to the bank, which had succeeded to whatever rights the consignor possessed, and of which it had received notice, would not be impaired by anything which took place between the consignor and consignee after such notice.

[2] The question, therefore, resolves itself into this: Was any such notice ever given to the consignee defendant before it sold the eggs and paid over the money? The defendant insists it had no such notice, while the plaintiff is equally insistent that notice was given; and it must be conceded that no notice was given or received, unless the presentation of the sight draft, with the bill of lading and invoice attached, and demand of payment, which was made on the consignee by the Chase National Bank on January 26, 1920, was notice to the defendant that the plaintiff was the owner of a special property in the eggs and the proceeds thereof in the sum of $8,424.

In Means v. Bank, 146 U. S. 620, 629, 13 Sup. Ct. 186, 189 (36 L. Ed. 1107) cattle were consigned to the defendants at Kansas City to be sold. At the same time the bank, which discounted the draft attached to the bill of lading, forwarded the documents to its correspondent at Kansas City for collection. The defendants received them on September 15th, about 9 a. m., and between 2 and 3 o'clock p. m. on the same day the defendants sold them to the Armour Packing Company. The draft and bill of exchange were presented to the defendants between 10 and 11 o'clock on that same day, and more than three hours before the cattle were sold. It was not paid. The defendants afterwards applied the proceeds of the sale on an old account against the consignor. It was claimed that the defendants had no knowledge or notice that the plaintiff claimed to have any interest in the cattle or lien thereon. The Supreme Court sustained the right of the bank to recover. The court said:

"Therefore the defendants had legal notice of the existence and presentation of the draft and the bill of lading, between three and four hours before they sold the cattle and received the proceeds. They cannot occupy the position of innocent purchasers of the cattle."

The court also said:

"It is very clear that the furnishing by the plaintiff of the purchase money for the cattle, on the faith of the agreement by Lyons that they and their proceeds would be security for the amount, and that a draft would be drawn therefor on the consignee against the cattle, with the further agreement that a bill of lading was to be obtained and turned over to the plaintiff, constituted a lien upon and a pledge of all the cattle, so far as the defendants were concerned; they having acquired no new rights, and not having changed their position in any essential respect, on account of the transaction, even though the bill of lading issued did not by its terms include the two carloads shipped in the name of Guthrie."

In Marine Bank v. Wright, 48 N. Y. 1, the plaintiff discounted the draft drawn by the consignor and transmitted it, with the bill of lad-

ing attached, for the acceptance of the consignee. It was promptly presented at the defendant's office in that form, but defendants did not see it, and it was not brought to their attention, but they were held to have had legal notice notwithstanding. The court said:

"It was promptly presented to the defendants in that form. That the defendants happened to be absent from their office, and that their clerk failed to inform them that the bill of lading was annexed to the draft, was their misfortune. The fact, however, of legal notice that the draft and the bill of lading were thus connected together, that the one was security for the other, was thus clearly brought home to the defendants. * * * The defendants received the corn, subject to the rights of the plaintiff, and, having applied it to their own use, are liable to the plaintiff for the money advanced upon it."

And it was held that the defendants could not apply the proceeds to an existing debt of the consignor.

In Bank v. Jones, 4 N. Y. 497, 501, 55 Am. Dec. 290, it is stated:

"The presentation of the draft to Jones for acceptance with the bill of lading annexed, by the collecting agent of the bank, was notice to him of the interest of the latter in the flour."

It is true that in the Means Case and in that of the Marine Bank the title in the goods shipped was in the consignor, and in the instant case by virtue of the Bills of Lading Act it was nominally in the consignee. But as the consignee had not purchased the eggs, or advanced any money on them, and had not even heard anything about them, until the draft was presented, it had no present or beneficial interest of its own in them at that time, and when it accepted delivery of them from the carrier it must be held to have had notice that its principal, for which it was acting, had created a lien on the property shipped which was good as against the consignor, and therefore good as against the consignee, who was simply the consignor's agent.

The presentation of a bill of lading with a draft drawn by the consignor attached has a definite commercial significance. It seems to be established law that, if a vendor takes a bill of lading in his own name and indorses it in blank, and attaches thereto a draft drawn on the vendee for the purchase price, the joinder of the draft and the bill of lading makes payment a condition precedent to the delivery of the bill of lading and the vesting of title in the purchaser of the goods. North Pennsylvania R. Co. v. Commercial National Bank, 123 U. S. 727, 8 Sup. Ct. 266, 31 L. Ed. 287; Dows v. Milwaukee National Exchange Bank, 91 U. S. 618, 23 L. Ed. 214; Fowler v. Treadwell (C. C.) 13 Fed. 22, 24; Forty Sacks of Wool (C. C.) 14 Fed. 643, 645; Seeligson v. Philbrick (C. C.) 30 Fed. 600; Schreiber v. Andrews, 101 Fed. 764, 766, 41 C. C. A. 663; Portland Flouring Co. v. British, etc., Insurance Co., 130 Fed. 860, 864, 65 C. C. A. 344.

In Williston on Sales, § 289, that writer, discussing the practice of a shipper's attaching the draft to a bill of lading, whether he has the draft discounted or not, and their being then sent forward and presented to the party to whom the merchandise is forwarded, says:

"So common has this practice become that the mere fact that a bill of lading and a draft are attached together indicates that the shipper intends to make the delivery of the goods conditional upon the payment of the draft. This rule is accordingly enacted in the Sales of Goods Act and the English provi-

sion is copied in the American Sales Act (subdivision 4 of section 20). The authorities collected in the note show that the courts have fully recognized the meaning and validity of the mercantile custom."

And in 35 Cyc. 333, 334, after stating the rule as above it is said:

"And even when the buyer is named as consignee, if the bill of lading with draft attached is sent to the seller's agent or bank for collection the property in the goods is reserved and does not pass to the buyer until payment."

The cases support the law as above stated that title does not pass without payment of the draft. Merchants' Exchange Bank v. McGraw, 59 Fed. 972, 8 C. C. A. 420; Newcomb v. Boston, etc., R. Co., 115 Mass. 230; Freeman v. Kraemer, 63 Minn. 242, 65 N. W. 455; Burditt v. Howe, 69 Vt. 563, 38 Atl. 240; Hilmer v. Hills, 138 Cal. 134, 70 Pac. 1080; Sims v. Norfolk, etc., R. Co., 130 N. C. 556, 41 S. E. 673. In some of the cases it is stated that a different intention may, however, be indicated by the circumstances of the transaction, and will, of course, control.

In C. E. White Co. v. Century Savings Bank, 229 Fed. 975, 144 C. C. A. 257, the Circuit Court of Appeals in the Seventh Circuit had before it a case which, like the instant case, involved the Bills of Lading Act. In that case a stock buyer at Des Moines shipped hogs on a straight bill of lading to a commission merchant at East St. Louis as consignee, and discounted with the bank a demand draft for $3,900 on the consignee. The bank transmitted the bill of lading and draft attached to its correspondent bank at Kansas City. The hogs arrived at East St. Louis on June 23d, and were delivered to the consignee and sold by the latter on the same day, under a continuing authority previously conferred by the consignor to sell promptly on commission hogs received from him. The draft and bill of lading were not presented to the consignees until two days after the sale. Under the circumstances, the holder of the draft was held not entitled to maintain trover for the conversion. The ground for the decision is based solely on the want of notice of the existence of the draft and the rights of the bank at the time the consignee made the sale. It seems clear to us that, if the consignee had received the notice prior to the sale, the court would have reached a different conclusion.

It was said in the above case that, if the consignor be in truth the owner and the consignee merely his factor, the consignor may transfer his interest as owner to a third person. We think that proposition is incontrovertible. We also agree that for that purpose his assignment on and delivery of the bill of lading would be of no greater force than would be a separate bill of sale while the chattels were in possession of the carrier, or in that of the factor consignee, so long as he is without notice. But if the factor, while still in possession and control of the chattels, receives actual notice of his principal's prior sale of the chattels and transference of the bill of lading to a third party, he cannot thereafter deal with the goods as those of his principal, except at his peril. And if before the goods reach the factor's hands, or thereafter while they remain in his hands, he is presented with a straight bill of lading and a sight draft attached thereto, which have been transferred by his principal, this is notice to him of what amounts to a revo-

cation of his authority to deal with the goods under the prior instructions given by his principal, unless he makes payment of the draft.

In conclusion it may be said that a motion was made, prior to the argument on the merits, to dismiss the writ of error on the ground that the defendant had waived the right of review by filing a proof of claim against the bankrupt estate of Grant Bros., Inc., the consignor and drawer of the draft, its proof of claim being based upon the judgment which the writ of error brought up for review, and by receiving a dividend on such claim. At the time the motion to dismiss was made we announced we would not decide it until after hearing the merits. As we have reached a conclusion that on the merits the judgment rendered should be affirmed, it is unimportant to consider the motion to dismiss.

Judgment affirmed.