## MEANS *v.* BANK OF RANDALL.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF KANSAS.

No. 63. Submitted December 2, 1892. — Decided December 19, 1892.

L. desiring to purchase cattle from P., a bank paid the purchase money for L. to P.; and P. delivered the cattle to the bank, and they were shipped by rail to M., in six cars, to sell, accompanied by P. and L. and one G. A bill of lading for four of the cars was issued in the name of L. A bill of lading was to be issued for the other two cars in the name of G., as a pass could be issued to only two persons on one bill of lading. G. had no interest in the cattle. The cattle in the six cars were delivered to M. A draft was drawn by L. against the shipment on M.; and endorsed and delivered by L. to the bank, with the bill of lading for the four cars. The draft and bill of lading were presented to M., but the draft was not accepted or paid. Three hours afterwards M. sold the cattle but kept the proceeds because he claimed that L. was indebted to him on an old

account. *Held*, that the bank was entitled to recover the proceeds from M.

The bank had a lien upon, and a pledge of, all the cattle.

The transfer of the bill of lading was a transfer of the ownership of the cattle covered by it.

There was a verbal mortgage or pledge to the bank of the two car loads, and G. represented P., and through him the bank.

It was proper for the trial court, as a question of law, to direct a verdict for the bank.

The question whether a trial shall be postponed on account of the absence of a witness for the defendant, and the illness of one of his counsel, is a matter of sound discretion and will not be reviewed where no abuse is shown.·

No specific instructions were prayed for by the defendant, and no request was made to direct a verdict for him, but he only requested the court generally to submit instructions to the jury.

THE case is stated in the opinion.

*Mr. B. P. Waggener* and *Mr. H. M. Jackson* for plaintiffs in error.

*Mr. Edward H. Stiles* and *Mr. Charles Blood Smith* for defendant in error.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is an action brought in the district court for the county of Cloud, in the State of Kansas, by the Bank of Randall, a Kansas corporation, doing business at Randall, in that State, against C. G. Means, W. W. Means, and C. H. Means, copartners as C. G. Means & Sons, to recover $6700, $4 protest fees, and $402 damages. The suit was accompanied by an attachment, and, before answer, was removed by the defendants, who were citizens of Missouri, into the Circuit Court of the United States for the District of Kansas.

The amended petition filed in the Circuit Court of the United States set forth the following cause of action: On September 14, 1887, one Patterson was the owner of 98 cattle, of the value of $6700, which he agreed to sell to one Lyons, who applied to one Bramwell, the cashier and agent of the

plaintiff, for a loan of $6700, to pay for the cattle, until he could ship them to Kansas City and sell them. It was agreed by Patterson, Lyons and the plaintiff, that if the plaintiff would advance and pay to Patterson $6600 and $100 for expenses, the plaintiff should have a lien upon the cattle, and retain the title to them, until the money was repaid; that the cattle should be shipped by Lyons as consignor, by way of the Missouri Pacific Railroad, to the defendants at Kansas City, Missouri; and that four car-loads of the cattle were to be shipped in the name of Lyons as consignor, and two car-loads in the name of one Guthrie as consignor. The defendants were engaged at the time in buying and selling live stock at Kansas City. In pursuance of that agreement, Patterson sold and delivered the 98 cattle to Lyons, and the plaintiff paid to Patterson the $6700. Lyons delivered the cattle on board the cars of the railroad company, in the town of Randall, consigned to the defendants at Kansas City, and received from the railroad company one bill of lading, for four cars, by which that company acknowledged the receipt of the cattle from Lyons, and agreed to deliver them to the defendants at Kansas City. This bill of lading Lyons endorsed and delivered to the plaintiff. No bill of lading was issued to Guthrie, but by agreement between the agent of the railroad company, Lyons, and the plaintiff, two cars were loaded each with 16 steers, and shipped to the defendants at Kansas City, as consignees, and Guthrie as consignor. The four cars for which the bill of lading was issued in the name of Lyons contained 66 steers in all. It was agreed by the company, Lyons and the plaintiff, that the plaintiff waived no title to the steers, or to the money to be derived from their sale, by permitting them to be shipped in the name of Guthrie; and that they should be delivered to the defendants with the other steers, and the proceeds be applied to the payment of the $6700. Thereupon, Lyons drew his draft on the defendants, dated September 14, 1887, whereby he directed them to pay to his order $6700, at sight, in Kansas City, which draft he endorsed and delivered to the plaintiff. The 98 steers were transported by the railroad company to Kansas City, and to the stock-

yards there, and on September 15, 1887, at 9 o'clock A.M. delivered to the defendants according to the contract set out in the bill of lading. The defendants received the steers, sold them for account of Lyons, converted the proceeds to their own use and benefit, and refused to pay the plaintiff for any of them or render to it any account of sales. At the time the steers were delivered to the defendants, the latter were advised by Lyons that the plaintiff had advanced the money to pay for the steers, and that Lyons had drawn his draft on the defendants and assigned it to the plaintiff. By those transactions, the plaintiff became the owner of the steers, and entitled to their proceeds. On September 15, 1887, at 11 o'clock A.M. the draft and bill of lading were presented to the cashier of the defendants, at their office in the Kansas City stock-yards, and payment demanded. The cashier, after examining the draft, directed the bank messengers who brought it to leave it at the Stock-Yards Bank, promising to pay it if they would do so. The draft was so deposited, and at 2.30 o'clock P.M. of the same day was presented by the messengers of that bank to the defendants at their office, payment was refused, and the draft was protested for non-payment. When the draft and bill of lading were first presented to the defendants, the steers had not been disposed of by them, and were being received by them from the cars. For more than twelve months before September 14, 1887, Lyons had been engaged in shipping stock to the defendants, and accustomed to drawing drafts in favor of the plaintiff and others against such shipments, and transferring the bills of lading and cattle so shipped to the parties holding such drafts on account of the shipments. The defendants, before September 15, 1887, were accustomed to and did pay all such drafts, and had never refused payment of any of the same. The defendants had not paid to the plaintiff any part of the $6700.

The defence set up in the answer to the amended petition was, that before the shipment of the cattle the defendants advanced to Lyons more than $7500, to be used by him to buy cattle for them, with the agreement that the cattle, when purchased, should be delivered by him to the defendants to

be sold by them on account of such advances, and that the cattle were to be delivered on board of the cars at Randall, Kansas; that the cattle in question were delivered to the defendants at Randall on board of the cars; that four cars thereof were consigned to the defendants as per the bill of lading; that no bill of lading was issued for the two cars shipped by Guthrie; that all of the cattle, at the time they were delivered to the defendants, were their property and in their possession before the bill of lading was delivered to the plaintiff; that Lyons and Guthrie accompanied the cattle from Randall to Kansas City and remained with them while in transit; that when the cattle reached Kansas City the defendants took them from the cars with the knowledge and authority of Lyons and Guthrie, and with like knowledge and authority sold the cattle and applied the proceeds in payment of the amount so advanced to Lyons; that the bill of lading was never endorsed to the plaintiff, and the latter had no right or authority, by virtue of its corporate power, to receive the same or take any title to it or the property represented by it; that the defendants had no knowledge or notice that Lyons had drawn any draft on them until the cattle had been received and sold by them and the proceeds applied as aforesaid; that the draft was not drawn with the knowledge, consent or authority of the defendants or any one of them; that, as to the two cars of cattle, no bill of lading was issued by the railroad company, and no delivery thereof, symbolic or otherwise, was made to the plaintiff; that the plaintiff did not have possession of any of the cattle at any time; and that the defendants had no notice that the plaintiff claimed to have any interest therein or lien thereon.

The case was tried before a jury, which was directed by the court to render a verdict for the plaintiff for $6681.55. The defendants objected and excepted to such direction, and prayed the court to submit instructions to the jury on the pleadings and evidence, which prayer the court refused, and to such refusal the defendants excepted. The verdict was rendered accordingly, and a judgment was entered thereon in favor of the plaintiff against the defendants for $6681.55. The defend-

ants made a motion for a new trial, which was denied; and then the court signed a bill of exceptions containing all the evidence offered or received on the trial. The defendants then sued out from this court a writ of error.

The evidence shows the following state of facts : Patterson owned the 98 head of cattle, which Lyons desired to buy, but he did not have the means. Lyons, in company with Patterson, applied to Bramwell, the cashier and agent of the plaintiff, to borrow from it $6700 to pay for the cattle and the expense of their shipment, until they could be sold at Kansas City. The plaintiff, after its cashier had examined the cattle and become satisfied that they would be sufficient security, agreed to pay the purchase price of them to Patterson, on the express condition that the plaintiff should have a lien upon, and a pledge of, the cattle as its security for making the advance, until they were shipped to and sold by the consignee at Kansas City. To that end, it was agreed that delivery of the cattle should be made by Patterson to the plaintiff, which was done, and that the plaintiff should have the title to, and right of possession of, the cattle until they were sold by the consignee and the plaintiff was reimbursed from the proceeds. Patterson, at the request and as the representative of the plaintiff, was to go with the cattle to Kansas City. The defendants' firm was selected as the consignee to receive and sell the cattle, which were shipped accordingly, on September 14, 1887, in six cars of the Missouri Pacific Railroad Company, accompanied by Patterson, Lyons and Guthrie. Guthrie desired to get a pass to Kansas City, and Lyons had arranged with him to go with the cattle. As under the rules of the railroad company, only two persons could get passes on account of a single shipment or billing of cattle, four of the cars were to be billed as shipped by Lyons, and the other two as shipped by Guthrie. A bill of lading for the four cars was issued by the company in the name of Lyons; but as Guthrie had not yet arrived, no bill of lading was issued to him for the two cars, but they were billed to him in his absence. Lyons transacted that part of the business with the agent of the railroad company, Bramwell being then at the bank. The

cattle were started on September 14, 1887, and reached the Kansas City stock-yards about 9 o'clock A.M. on September 15. After they were unloaded into the chutes of the Stock-Yards Company, they were delivered to the defendants, and between 2 and 3 o'clock P.M. on September 15 were sold by them to the Armour Packing Company for $6133.

At the time of the arrangement for the advance of the purchase money by the plaintiff, it was agreed that a draft for the amount advanced should be drawn by Lyons against the shipment on the defendants, to be accepted by them and paid out of the proceeds of the sale of the cattle. The draft was drawn and was endorsed and delivered by Lyons to the plaintiff, together with the bill of lading which had been issued for the four car-loads. On September 14, 1887, the plaintiff forwarded this draft, with the bill of lading attached to it, to the Bank of Commerce, its correspondent at Kansas City, for collection. It was received by that bank early on the following morning, and was given to its messenger for presentation and collection at the office of the defendants, which was in the Live Stock Exchange Building, at the stock-yards. Between 10 and 11 o'clock A.M. of the same day, and more than three hours before the defendants sold the cattle, the draft and bill of lading were presented by the messenger at the counter of the defendants, to their agent in charge of their office, who, after examining those papers, returned them to the messenger and told him to leave them at the Stock-Yards Bank, this being the custom at the stock-yards with respect to drafts which the messengers of other banks failed to collect on presentation. Between 2 and 3 o'clock P.M. of the same day, the draft was presented by the collector of the Stock-Yards Bank at the office of the defendants for payment; and between 3 and 4 o'clock P.M. of that day, it was presented by the cashier of that bank, and formerly protested by him for nonpayment. The defendants converted the proceeds of the sale of the cattle to their own use and refused to pay the draft, giving as their reason for so doing that Lyons was indebted to them on an old account, and that they had a right to apply those proceeds thereon.

There was no dispute about the foregoing facts. In addition, Patterson and Lyons testified that on the morning of September 15, 1887, the day when the cattle reached Kansas City, one of the defendants was notified personally that the plaintiff had paid for the cattle, and that a draft therefor had been drawn on the defendants and delivered to the plaintiff. No money was paid by the defendants, and the only justification attempted by them was their claim of a right to apply the proceeds of the cattle on their old account against Lyons.

It is very clear that the furnishing by the plaintiff of the purchase money for the cattle, on the faith of the agreement by Lyons that they and their proceeds would be security for the amount, and that a draft would be drawn therefor on the consignee against the cattle, with the further agreement that a bill of lading was to be obtained and turned over to the plaintiff, constituted a lien upon and a pledge of all the cattle, so far as the defendants were concerned, they having acquired no new rights, and not having changed their position in any essential respect, on account of the transaction, even though the bill of lading issued did not by its terms include the two car-loads shipped in the name of Guthrie.

As to the four car-loads named in the bill of lading, that instrument represented the cattle; and the transfer of the ownership as well as of the right of possession was made as effectually by the transfer of the bill as it could have been by a physical delivery of the cattle. *Conard* v. *Atlantic Ins. Co.,* 1 Pet. 386, 445; *Dows* v. *Nat. Exchange Bank,* 91 U. S. 618.

When the bill of lading was transferred and delivered as collateral security, the rights of the pledgee under it were the same as those of an actual purchaser, so far as the exercise of those rights was necessary to protect the holder. *Halsey* v. *Warden,* 25 Kansas, 128 ; *Emery* v. *Bank,* 25 Ohio St. 360 ; *Dows* v. *Nat. Exchange Bank,* 91 U. S. 618 ; *Bank* v. *Homeyer,* 45 Missouri, 145 ; *Bank of Green Bay* v. *Dearborn,* 115 Mass. 219 ; *Bank of Rochester* v. *Jones,* 4 Comstock, (4 N. Y.) 497 ; *Holmes* v. *German Security Bank,* 87 Penn. St. 525.

: A bank which makes advances on a bill of lading has a lien to the extent of the advances, on the property in the hands

of the consignee, and can recover from him the proceeds of the property consigned, even though the consignor be indebted to the consignee on general account; and the consignee can- not appropriate the property or its proceeds to his own use in payment of a prior debt. *Conard* v. *Atlantic Ins. Co.*, 1 Pet. 386; *Gibson* v. *Stevens*, 8 How. 384; 3 Parsons on Con- tracts, 487.

As to the two car-loads shipped or billed in the name of Guthrie, for which no bill of lading was issued, Guthrie had no interest in them, and the shipment in his name was merely to procure for him a pass from the railroad company. What took place between Lyons and the cashier of the plaintiff, at the time when the draft and the bill of lading were delivered to the plaintiff, amounted, as to the two car-loads, to a verbal mortgage or pledge of the cattle in those two cars to the plaintiff, to secure its advance, and on the faith of it the ad- vance was made. There is no conflict of testimony on this subject. There was a verbal mortgage or pledge of all the cattle to the plaintiff as security for its advance. Patterson delivered all the cattle to the plaintiff, and, at its request and as its agent, he was placed in charge of and accompanied the shipment. Guthrie, if representing any one, represented Pat- terson and through him the plaintiff. Patterson arranged with Guthrie that the latter should go.

As the verbal mortgage or pledge included all the cattle, and was accompanied by a delivery, it was good, at least as against the defendants, irrespective of any question of notice. The defendants were chosen as factors, they having before acted for the same parties in similar transactions, where drafts had been drawn on them against the shipments. They did not advance any money on account of this shipment, they parted with no interest, relinquished no legal right, and stood in no better position to dispute the validity of the mortgage or pledge than did Lyons himself. It was perfectly valid as against Lyons, and he could not have been heard to dis- pute it.

But the defendants had notice that the draft had been drawn by Lyons against the cattle and had been endorsed to

the plaintiff, and this was soon after the arrival of the cattle at Kansas City and several hours before they were sold. The draft was presented for payment, accompanied by the bill of lading, at the counter in the office of the defendants, and to their agent in sole charge there, between 10 and 11 o'clock A.M. of the day on which the cattle arrived; and the sale of the cattle to the Armour Packing Company was not made until between 2 and 3 o'clock P.M. on that day. Therefore, the defendants had legal notice of the existence and presentation of the draft and the bill of lading, between three and four hours before they sold the cattle and received the proceeds. They cannot occupy the position of innocent purchasers of the cattle.

The question resulting from the facts of the case was purely a question of law; and the verdict for the plaintiff was properly directed. If the question had been submitted to the jury, and they had found a verdict for the defendants, it would have been the duty of the court to set it aside.

In addition, the evidence shows that one of the defendants had explicit notice from Patterson and Lyons, shortly after the cattle arrived at Kansas City, that the plaintiff had advanced the money to pay for them, and that the draft was out against the defendants therefor.

The foregoing views are supported by the following cases: *National Bank* v. *Porter*, 73 California, 430; *Darlington* v. *Chamberlin*, 120 Illinois, 585; *Bates* v. *Wiggin*, 37 Kansas, 44; *Morrow* v. *Turney*, 35 Alabama, 131.

It is contended by the defendants that the Circuit Court erred in denying their motion for a postponement of the trial of the cause, based on the absence of a witness named Wells, and the illness of Mr. Waggener, one of their counsel.

But the testimony sought to be given by Wells was immaterial and incompetent. The question of the postponement of a trial is one ordinarily addressed to the sound discretion of the trial court, and in the present case no abuse of that discretion is shown. The defendants really had no defence to the suit; and the bill of exceptions shows that all which they could, under any circumstances, make out of their attempted defence was availed of.

The bill of exceptions shows that the only position taken by the defendants at the close of the evidence was a prayer to the court "to submit instructions to the jury upon the pleadings and evidence." No specific instructions were prayed for, and no request was made to direct a verdict for the defendants. The defendants contented themselves with objecting and excepting to the direction of a verdict for the plaintiffs, and to the refusal of the court generally to submit instructions to the jury.

*Judgment affirmed.*