# Marine National Bank of Buffalo, Appellant, *v*. Baringer.

*Bills of lading—Draft—Assignment—Carriers.*

1. A bill of lading takes the place of the property described therein, and an assignment of it gives to the person to whom it is transferred such title as the assignor had, and this only when it is the intention of the parties that such change of title shall take effect.

2. A consignor can only transfer title by delivery of the bill of lading while title to the property is in himself.

3. The discounting of a draft attached to a flat bill of lading for a car of corn does not give the discounting bank an equitable lien upon the car of corn, where no act on the part of the consignor creating such a lien is shown, and where the consignee had no notice that the bank had discounted the draft.

4. Where there is nothing in the bill of lading to show that the consignor was the owner of the corn at the time the draft was discounted, a lien cannot be asserted as an inference from the fact of the delivery of the bill of lading at the time the draft is assigned to the bank.

Argued Oct. 14, 1910.   Appeal, No. 78, Oct. T., 1910, by plaintiff, from judgment of C. P. No. 2, Phila. Co., Sept. Term, 1908, No. 1,569, on verdict for defendant in case of Marine National Bank of Buffalo v. Milton F. Baringer. Before RICE, P. J., HENDERSON, MORRISON, HEAD, BEAVER and PORTER, JJ.   Affirmed.

Assumpsit for money had and received.   Before SULZBERGER, P. J.

The court charged in part as follows:

The Niagara Milling Company was a concern in Buffalo, apparently in active business, and probably in good credit which it did not deserve.   It dealt with the Marine Bank of Buffalo, which appears to be a prosperous, well managed financial concern.   It dealt with Baringer in Philadelphia, who is rated no doubt as a grain broker, but is not quite a grain broker, and his position helps to

complicate the situation. Let us ascertain exactly what he is. A broker, or a del credere factor, is a man who represents the shipper who has goods to sell, and on account of the shipper whose goods he sells, he makes the sale to a customer for the shipper, and for the service of making the sale he receives a percentage called a commission. When he does that the proceeds of the sale and the risks of the sale all belong to the shipper and not to the factor. The factor only gets his commission, and the owner gets the price of the goods and suffers the loss on the goods. When the owner is unwilling to suffer the loss and says, "I do not want to trust this customer," then the factor or broker says, "I will guarantee," and when he guarantees he gets another commission for guaranteeing, and then it is his risk.

[Now, Baringer was not exactly that, nor was he exactly a common buyer, an ordinary merchant. He appears to have gone into the atmosphere of the brokers or commission merchants, to have to a certain extent preserved his attitude of broker or commission merchant with some shippers, and with the bulk of the shippers whose accounts he handled to have been a mere merchant, that is, he bought at the best price he could and sold at the best price he could, and the balance he kept as profit. Therefore, as it is admitted that he acted in both capacities, there is always a certain amount of trouble in ascertaining in which capacity he did act in a particular affair. That question arises here. The positive evidence that he and his clerks give is that he acted as a merchant merely, that he bought at a fixed price and that he sold at his own risk. The language he uses (and it is all before you), is, to use his own words, "It looks silly now." It is the language that is properly usable of a del credere transaction, a commission business. When he says to the owner of the goods, "I think I can sell to somebody," and the owner says, "All right, resell," and he replies, "I cannot do it for cash. Bill on thirty days," and the owner says, "All right," you see at once that it is not free from characteristics which

are in their nature ordinarily inconsistent with the position of a mere merchant. When you as a merchant buy corn, boots, or anything else, and buy it as your own, you do not ask the shipper or manufacturer what you shall do with it. You select your own customer, and you sell it to him for cash, or on ten days, or ninety days, or two years if you want to, and you get no man's leave or assent. He, being mixed up in this thing, practically tells you that though this was an absolute, out and out mercantile affair, that he intended it to be such, but that inadvertently, habitually, otherwise foolishly, he did use some of the language which belongs to the del credere factor vocabulary and not to the vocabulary of merchants. That is for you to determine. You ought to ascertain, was this an out and out purchase by Baringer from the Niagara Company, or was it not?] [3]

Let us assume it most favorably for the plaintiff, that it was not an out and out purchase, and that he was a commission merchant, a factor. Let us see what would happen then. Then we must examine what the real transaction is in Buffalo. Both sides have presented to you what they say is the real transaction, and I think neither of them is real. The real transaction seems to me to have been this. The Niagara Milling Company had a good credit in the Marine Bank. Whether by inadvertence or otherwise we do not know, but it shipped erroneously this very car-load of goods, and consigned it to Baringer, who had not bought it and had not sold it, and when it shipped them it immediately drew a draft on Baringer, who had not bought it, for the value of it, and deposited that draft with the bank who took it as a cash deposit.

The interest of the bank was at that time the collateral security of that car-load of goods, with which Baringer had then no more to do than you had. It was not his. He had not ordered it. He had not bought it. He had not sold it, and he did not want it. For a reason which was their own, either by an ordinary mistake in doubling an order, or maybe by a desire to use $400 or $500 that day that they

could not get somewhere else (you may under the developments afterward suspect even that), they put this duplicate shipment on the rails, and they got the money from the bank on July 13, 1907, and then the bank parted with its money, which it never got again, though it went through some of those mystical motions which it calls payment and discount, but the money that was paid to this man on July 13 for the Niagara Milling Company it never got again except by bookkeeping. Bookkeeping is a very poor substitute for money. You will find that if you have $500 in money and go out into the market, you can get much more for it than if you have $500 in bookkeeping entries. As I say, on July 13 they paid the money for this to the Niagara Milling Company, and then after a while it turns out that that draft, which they have drawn nominally on Baringer, is really drawn on nobody. There is not any Baringer for those goods. Then they begin telegraphing, and Baringer says, "I can find a customer, but he is at Yerkes. It will cost $25.00 or $30.00 to transfer the car. You will have to bear that, and the man Landis at Yerkes will not pay on sight, it is thirty days. You will have to stand that delay." The bank, which has paid out the money on the thirteenth, expects it back on the twentieth, twenty-second or twenty-third, and begins to get impatient and says, "What is the matter with this?" Then he has to tell them what is the matter. He says, "There has been a blunder, but I am going to sell it. I have already made arrangements by telegraph. Baringer has another customer for it, but that customer will not pay inside of thirty days." They said, "You have this thing on our books as paid. You had this cash ten or twelve days ago, and we have nothing. That does not look well for a bank examiner, to carry as cash things that have been discredited for ten or twelve days. You have to do something else." He said, "All right, I will pay this." That is the Micawber fashion of payment. There is another payment made. How does he pay it? He goes to the assistant cashier and draws another draft at thirty

days on Baringer. Then the cashier O. K.'s it, and it is handed to the discount clerk, and the discount clerk writes to the credit of the milling company the net discount, and he, of course, gives a check against that to pay the first entry, and makes it good. Has anything been done? The mischief was done on July 13. That is when they gave him the money, and they never got it back. They gave him the money when Baringer had nothing on earth to do with it, but Baringer did get something to do with it, and there is the one weak point in Baringer's case. When they told him they wanted him to buy it, he did say to the Niagara Milling Company, in the words of his letter of July 19, "Hold that check over for thirty days until the Landis payment gets through, and then it will be paid." That is the talk of a prosperous man who does not know the difficulties of the impecunious man. It is easy enough for him to say "Hold it over," but the other man could not hold it over because the bank was treading on his heels. He had to give some live assets for a dead, unpaid check, and the result was they said, "We will send a thirty days' draft." They sent a thirty days' draft to him as a substitute for the first draft, and they had in the meanwhile so played with that car that as regards the actual control of it they had really given it to Baringer, and as far as the bank was concerned it was not considered. Baringer had virtually control of that car, and the railroad had no instructions to hold it against payment. All was done on a matter of credit and good faith. That is a highly creditable thing for the American merchant, and we will not let any man take advantage of the fact that his good faith is rated so high. Baringer could not have had this reputation of having these things allowed to go to him without any care at all, if it was not because they rated him high. You notice that the Girard Bank did what, if men were dealing at arm's length with each other, would be a very foolish thing. When the draft was due they left it with him on the faith that he would send the check for it, and if he would not that he would return the draft. He

preferred not to send the check for it and he returned the draft. That is the way the dealing has been all through, and therefore we must not penalize anybody for dealing in the highest good faith, because that seems to be an advance in modern merchandising, that they deal largely on good faith and do not expect tricks.

[Therefore the real question was, did Baringer really know that the National Bank had any interest it it? You have the evidence on the subject. Baringer said positively he did not. That may not go entirely the whole length, because there are many things Baringer does not know about his business. He has a certain routine there in which the clerks do business and he has to do things which require his personal attention. You must not make any differentiation about that. When King knows it Baringer knows it. Even if he does not know it he has to accept knowledge. When he puts King in part of his factory, when King knows it he must accept responsibility for knowing even when he did not find out. That is not our business. Did they know between them? It is an open question. They say no. The other side say yes, so it is for you. If they did not know and this thing was delivered to them flat, they need not bother themselves about that bank. What they did not know did not concern them, and they were not bound on the mere notice that can be tortured out of the things on the bill of lading. They were not bound to know that the bank had absolutely a beneficial interest in it. They were only bound to know what the notice told them, and what came to them from any other source, and whether as a matter of fact the notice caused them to believe that the bank had an interest is a question of fact for you to determine. There is a dispute about that fact and you will decide it. As I say, if you decide that they had no notice and no knowledge, then I do not think they are liable to the bank in this action.

But if you decide that they had notice (and this is a decision you may well come to on some of the evidence), then there is this other question to consider.] [4] [Sup-

posing they had notice, what is the consequence? What are their relations to the bank, even if they know the bank had an equitable right in this? Their duty to the bank, if they knew that the bank had an equitable right, was to do everything that equity and good conscience dictate, that is, to do nothing that would subject the bank to loss, but where there are no legal relations between parties (and there were none between the bank and Baringer), equitable relations when they subsist on the one side also subsist on the other. They cannot exist except by mutuality. There is no method by which this bank can sue Baringer at common law. He did not deal with them, he did not buy from them, he did not sell to them, did not do anything with them, and at common law they have no relation to each other, and they cannot sue him. But there is something else besides the common law. There is that higher legal morality which we call equitable principles, and on them if in justice, in good conscience, he ought to see them through he is liable in this form of action, but that kind of equitable relation demands that there shall be reciprocity. They must treat him as fairly as he treats them. What is the relation there? See what has happened. The event that occurred is not this draft and not this bill of lading. It is the insolvency of the Niagara Milling Company, which is the only thing that produces all this trouble, an insolvency under most distressing and perhaps disgraceful circumstances. That altered the whole thing. In reality nobody cared much about how the thing was done. Everything was going along in jolly good fashion, as it had gone before. Nobody expected anything. Then comes this thunderbolt from a clear sky. This great Niagara Milling Company proves to be a sham, a delusion, and the president commits suicide. Then there is running to cover. It has been testified to only by one of the clerks who are witnesses for the plaintiff, and it has not been confirmed or perhaps denied (it may be partly denied), but whether it is denied or not, personally I have no doubt whatever (you may have, and of course facts are for you), that if

this trouble with the Niagara Milling Company had not occurred that draft would have been paid into the bank in thirty days when it was due. The reason it was not paid in the bank on the thirtieth day was because when they found the Niagara Milling Company was good for nothing and they had an account against it, they said to themselves, "If we present our account there we will get the ordinary dividend of an insolvent estate in a foreign state, with expenses for commissioners, receivers, lawyers, and all sorts of people who deduct things, so that what we will get will not amount to much. We had better hold on to what we have. This money we have we are going to appropriate to extinguish the claim we have against the Niagara Milling Company." Ordinarily they would have a perfect right to do that. So far as they knew there was not in the state of Pennsylvania any defendant they could sue. There was no property they could take except the property they had in their hands, and that they kept against the foreign vendor. What was the position of the bank? The bank when it heard this startling news of the insolvency of the company, was in a different position. The bank had a claim against the Niagara Milling Company for this draft, and they had two remedies against it. One they had by running after Baringer and squeezing him, and the other they had right in their hands. Here was a draft for less than $500, and they had a deposit of over $650 in their own hands. What is the equitable duty of a bank in Buffalo when it is considering the question of saving its $500 or thereabouts for its draft, as against another man who is only equitably bound to it? I think that you may well come to the conclusion if it is a matter of fact, of which I am not quite sure, but I leave it to you as a matter of fact. What is the fair thing for the bank to do? It can pay itself out of money in its hands, or it can pay the money which it has in its hands in the hands of the commissioner or referee or receiver and pursue this man who is only trying to protect himself. If you think that it is fair in equity for the bank to do that, in the in-

terest of equality, to pay it into the hands of the bankrupt's or insolvent's receiver, then you ought to find a verdict against the defendant, but if you think that the fair and square thing was to say, "That is the only way Baringer can save himself, and we can save ourselves this other way," then you ought to find against the bank.] [5]

Verdict and judgment for defendant. Plaintiff appealed.

*Errors assigned* were (3–5) in refusing binding instructions for the plaintiff; portions of charge as above, quoting them.

*R. Stuart Smith,* with him *Charles E. Morgan,* for appellant.—On all the authorities the plaintiff is entitled to recover, and there is no question for the jury: Means v. Bank of Randall, 146 U. S. 620 (13 Sup. Ct. Repr. 186); Holmes v. German Security Bank, 87 Pa. 525; Holmes v. Bailey, 92 Pa. 57; First Nat. Bank v. Kelly, 57 N. Y. 34; Missouri Pac. Railway Co. v. McLiney, 32 Mo. App. 166.

*Francis Shunk Brown,* of *Simpson & Brown,* with him *W. Howard Ramsay,* for appellee.—A bill of lading is evidence of the ownership of the goods in the person to whom it was drawn: Jordan v. Wilson, 25 Pa. 390; Griffith v. Ingledew, 6 S. & R. 428; Harrison v. Mora, 150 Pa. 481; Frank Bros. v. Railroad Co., 9 Pa. Superior Ct. 129.

The delivery of a bill of lading only passes such title in the goods as indorser had therein. A bill of lading does not stand on the same footing as strictly commercial paper: Empire Trans. Co. v. Steele, 70 Pa. 188; Franklin Trust Co. v. R. R. Co., 222 Pa. 96.

There was no intention of the parties (Niagara Company and Marine Bank) to create an equitable lien upon the corn in favor of the bank to the extent of the bank's advances.

The Niagara Company, at the time the note was dis-

counted and the lien created, was not in a position to create the lien by virtue of its ownership and possession of the property.

Baringer did not take the property with notice of the lien of the bank: Holmes v. German Security Bank, 87 Pa. 525; Holmes v. Bailey, 92 Pa. 57; Missouri Pac. Ry. Co. v. McLiney, 32 Mo. App. 166; Croyle v. Guelich, 35 Pa. Superior Ct. 356.

OPINION BY HENDERSON, J., April 17, 1911:

The plaintiff claims the right to recover against the defendant by virtue of a bill of lading attached to a draft drawn by the Niagara Mill & Elevator Company on the defendant on July 26, 1907, which draft was that day discounted by the plaintiff for the drawer with the bill of lading attached thereto for a car load of corn consigned by the drawer of the draft to the defendant at Belfry, Pennsylvania. The corn had been shipped to the defendant about two weeks before without a request from him, his order having been for one car and the consignor having sent two. When the cars were shipped the consignor drew on the defendant for the additional car of corn and this draft was refused for the reason that the corn had not been ordered but the defendant proposed to the consignor that he would sell the corn at another place in the event that he should be allowed thirty days' time. This proposition was accepted and thereupon the first draft drawn by the consignor was returned and canceled and the draft on which the plaintiff now sues was then made and discounted at the bank. The plaintiff claims a right to the corn and the proceeds thereof by virtue of the delivery of the bill of lading to it on July 26. The defendant contends that he was a purchaser of the corn; that it was delivered to him and in his possession on July 22, four days before the draft was discounted; that the consignor had no power on the day the bill of lading was delivered to the plaintiff to transfer a title to the property and that he had no notice of an intention, if any existed,

on the part of the elevator company, to give title to the
bank or to create an equitable lien.    The shipping bill was
what is known in commerce as a flat bill of lading in which
the defendant was the sole consignee.    Prima facie, there-
fore, the consignee had control of the property and strictly
speaking no person but him could pass the legal title to the
merchandise: Conard v. Atlantic Ins. Co., 26 U. S. 385,
445.    But assuming the right of a consignor to transfer
the title by delivery of the bill of lading this right must be
exercised while the title to the property is in the consignor.
His ability to create a lien depends on his ownership.    The
bill of lading takes the place of the property described
therein and an assignment of it gives to the person to whom
it is transferred such title as the assignor had, and this only
when it was the intention of the parties that such change
of title should take effect: Pollard v. Vinton, 105 U. S.
7; The Carlos F. Roses, 177 U. S. 655.    There was nothing
in the bill of lading to show that the elevator company
was the owner of the corn at the time the draft was dis-
counted and the claim of a lien is only asserted as an
inference from the fact of the delivery of the bill of lading
at the time the draft was assigned to the plaintiff.    Against
this inference was the information given by the bill of
lading that the railroad company held the corn on account
of the consignee.    The evidence as to the purchase by the
defendant is positive and clear and raised a question of
fact as to the time when the title to the corn passed from
the elevator company.    If the consignment had been
made pursuant to an order of the defendant there would
be no doubt that delivery to the railroad company would
have been delivery to the consignee and title to the pro-
perty would have passed at once.    It was entirely com-
petent for the shipper to agree on a sale of the corn after
it arrived at Belfry and to fix the time of payment.    If
this was done as shown by the testimony of the appellee
he became the owner of the property and had possession
of it before the appellant gave credit to the elevator
company on the draft.    What the elevator company

could then transfer was its claim or right of action against the defendant for the purchase money.

On the subject of the notice to the defendant of the lien of the bank, the defendant's evidence shows that the draft was first presented to the appellee's clerk on July 29, a week after the defendant had closed the arrangement for the purchase of the corn. It is not alleged that even then the defendant had notice of the claim of the bank, the appellant relying on the implied notice arising out of the possession by it of the bill of lading attached to the draft. It became a matter for the consideration of the jury, therefore, whether the defendant had notice of any claim of the appellant against the property, for conceding the inference of interest to arise from the possession of the bill of lading the testimony offered in behalf of the defendant tends to show that it was not brought to his attention in time. The cases cited by the appellant on this point are not analogous on their facts. Means v. Bank of Randall, 146 U. S. 620, was a case where there was an agreement by the shipper that money which he obtained from the bank for the purchase of cattle should be secured by a collateral pledge of them to the plaintiff and that the latter should have a lien on them to the amount of the money borrowed. There was the further important fact that at the time the arrangement was made and the lien created the shipper owned the cattle. It also appeared that the defendants had notice that money had been advanced on the shipment to pay for them and that a draft had been drawn for the amount of the loan. Holmes v. German Security Bank, 87 Pa. 525, and Holmes v. Bailey, 92 Pa. 57, were cases where the consignees were agents merely to sell and where the title remained in the consignor. We do not regard the case as one in which the court could have given binding instructions under the evidence, as contended by the appellant in the first and second assignments of error. What has been said disposes of the third assignment as well, for the plaintiff's case is based on the right of the

elevator company to create a lien at the time the draft was discounted which it may enforce in this action. There was a plain denial by the defendant of knowledge of any interest of the plaintiff in the property. The plaintiff contended that there was inferential notice. The defendant alleged this did not arise out of the evidence and the appellant has no ground for complaining that that question was submitted to the jury. There was evidence that the Niagara Mill & Elevator Company became insolvent about August 10, and that it had a credit in the plaintiff bank of an amount considerably in excess of the amount of this draft. It had been a patron of the bank and carried a balance there which it was permitted by the plaintiff to check out, and this gave color to the defendant's view that the bank accepted the draft for collection merely and made the discount on the credit of the elevator company. It is not an unreasonable assumption that the bank had notice of the financial embarrassment of one of its active customers, and the comment of the court that it was within the power of the bank to protect itself by the deposit which it held was not outside of the evidence. It cannot be said with legal exactness that any consideration of estoppel affects the appellee. Our statute prescribes the manner in which drafts are to be accepted, and there is no pretense that the defendant had bound himself by an acceptance or by a promise to accept. The most that is alleged is that one of his employees asked the collecting bank to hold for thirty days, but this bound nobody and the bank was at liberty to return the draft at any time. We are not convinced, therefore, that the matter complained of in the fifth assignment requires the reversal of the judgment. This was evidently not regarded as a prominent aspect of the case, for the evidence in its other branches was controlling and apparently decisive. We are not satisfied that the court was in error in the instructions complained of.

The judgment is affirmed.