### NATIONAL BANK OF ASHTABULA v. BRADLEY.

(District Court, W. D. New York. January 6, 1920.)

#### No. 1785.

1. Carriers ⬯⟜58—Possession of bill of lading presumptive evidence of ownership.

The possession of a bill of lading, whether indorsed or not, is presumptive evidence of ownership of goods therein described as against any person not showing a better title.

2. Carriers ⬯⟜58—Acts of drawer of bill of lading after discount of drafts do not affect discounter.

Any act of the drawer of a draft, after delivery of the bill of lading and discount of the draft, will not affect the rights of the person discounting the draft.

3. Banks and banking ⬯⟜127—Carriers ⬯⟜58—Rule that bank should act only as agent in collecting drafts applicable only to parties.

Rule of bank, that in receiving drafts it shall act only as agent for the depositor, applies only between the bank and its customer, and does not constitute the bank, which discounted drafts attached to a bill of lading, a mere agent of the owner as against an attaching creditor.

⬯⟜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. **Carriers** ⬳58—Bank, which discounted drafts attached to bill of lading, held owner of property.

Where a bank discounted drafts attached to a bill of lading, and gave credit to the depositor, who was already indebted, allowing the depositor to withdraw the excess, the bank became the owner of the property specified in the bill of lading, notwithstanding the depositor's attempts to induce the consignee, on whom the drafts were drawn, to dispose of the property; this being particularly true where the deposit slip giving credit contained no reservation.

5. **Bills and notes** ⬳356—Bank discounting drafts with bill of lading attached, holder for value.

Under Gen. Code Ohio, § 8193 et seq., bank, discounting drafts with bills of lading attached, even though the drawer has overdrawn his account, becomes a holder for valuable consideration.

6. **Carriers** ⬳58—Sheriff's seizure of grain, where bank had discounted drafts, held conversion.

Where, after a bank had discounted drafts with bills of lading attached, the sheriff seized the grain shipped under a judgment against the consignor, his act amounted to a conversion as against the bank, and an action for damages for conversion may be maintained.

7. **Carriers** ⬳58—Rights of bank discounting drafts not affected by payment of other indebtedness.

Where a bank discounted drafts with bills of lading attached, and gave the depositor credit, which he withdrew, the rights of the bank were not affected, because a relative of the depositor subsequently gave a note to secure other indebtedness due the bank, on which the depositor made payments, etc.

At law. Action by the National Bank of Ashtabula against Fred A. Bradley. Judgment for plaintiff.

Gibbons & Pottle, of Buffalo, N. Y. (Henry W. Pottle, of Buffalo, N. Y., of counsel), for plaintiff.

Dirnberger & Moore, of Buffalo, N. Y. (James O. Moore, of Buffalo, N. Y., of counsel), for defendant.

HAZEL, District Judge. This action was brought against the sheriff of Erie county, N. Y., for conversion of six cars of yellow corn, which were seized by him on July 5, 1918, under a writ of attachment in an action by the Buffalo Grain Company against the Horton Milling Company and Elmer C. Horton. Judgment was afterwards entered for $19,459.72, and execution issued thereon, under which the attached corn, amounting to 7,848 bushels, was subsequently sold.

The plaintiff bank herein asserts that it was the owner of the said corn, having become such by purchase of the bills of lading attached to six separate drafts discounted by it for and on account of the Horton Milling Company, and that the attachment and levy were unlawful. The evidence shows that one Horton, who carried on a business under the name of Horton Milling Company, on May 31, 1918, delivered the corn to the New York Central Railroad Company for shipment to the Globe Elevator Company at Buffalo; that the corn was loaded in six separate cars, and for each car a bill of lading was issued by the carrier to the original owner, which thereupon drew its several bills of exchange, directed to the Globe Elevator Company, with bills

---
⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of lading attached, and deposited the same in the plaintiff bank; Horton receiving cash credit therefor amounting to $12,652.04, after the president of the bank had signified his approval, as was customary in such transactions.

There was an overdrawn draft of $570.07 in the account of the Horton Milling Company at the time the drafts were deposited, and the entire balance was checked out afterwards. The drafts and bills of lading were promptly forwarded by the plaintiff to its agent, the Bank of Buffalo, for collection, but the drawee refused to pay. On June 8, 1918, the Bank of Buffalo, under instructions from the plaintiff left the bills of lading with the Globe Elevator Company to permit removing the corn, which had become heated, to a dry kiln, which, after drying, was stored in elevators. The plaintiff afterwards requested of the Globe Elevator Company the warehouse receipts and an account for the drying service, but such request was not complied with.

The question for decision is whether the transaction and conduct of the plaintiff, at the time of discounting the drafts, proves that the bank became the purchaser of the bills of lading from Horton, or whether they were taken for collection only. There was testimony on behalf of the defendant tending to show that the corn had not previously been sold to the Globe Elevator Company by Horton, but had merely been consigned to it as sales agent, and moreover that the consignee had not authorized drawing the bill of exchange against it; that on arrival at Buffalo, the corn was looked after by the consignee at the request of Horton who continually thereafter solicited sales at a certain price. The defendant claims generally that throughout the transaction Horton evidently held himself out as owner of the corn, and that the fair inference therefrom, and from other evidential circumstances, is that the drafts were credited upon the understanding that in case they were not paid they would be charged back to the account of the drawer. But I think the facts and circumstances in their entirety prove that the bank became the buyer of the grain and did not take the drafts merely for collection.

[1-4] The law relating to title of movable property in a person holding a bill of lading is clear. It has many times been held in this state that the possession of the bill of lading of the goods therein described, whether indorsed or not, is presumptive evidence as against any person not showing better title. City Bank v. R., W. & O. R. R. Co., 44 N. Y. 136. In the case of Marine Bank v. Wright, 48 N. Y. 1, the rule is tersely stated as follows:

"Where the consignor of property, upon its shipment and before delivery, draws a bill of exchange upon the consignee, and procures the same to be discounted at a bank upon the security of the bill of lading, which is transferred and delivered with it, the bank acquires title to the property described in the bill of lading, conditional upon the acceptance of the draft; upon such acceptance the title passes to the acceptor; but upon refusal to accept, the title continues unimpaired, and upon the receipt by the consignee of the property, and its conversion, he is liable to the bank for the money advanced upon it."

And in First National Bank v. N. Y. C. & H. R. R. Co., 85 Hun, 160, 32 N. Y. Supp. 604, it is stated that—

"Any act of the drawer after the delivery of the bill of lading and discount of the draft does not affect the rights of the person discounting the same."

. Hence it would seem that any communications passing between the drawer and the drawee of the bills of exchange do not affect the rights of the bank, which had previously discounted the drafts, or relieve the defendant from liability to the rightful possessor. It is urged that a form of deposit slip, in evidence, used at times by the bank, contained reservations to the effect that the bank acted as agent on out of town items and considered in connection with the communications passing between the drawer and drawee of the drafts, proves an intention to charge back the amounts if they were dishonored. Upon this point defendant cites, as an authority, First National Bank of Blanchester v. Stengel (Sup.) 169 N. Y. Supp. 217, affirmed (by a divided court) 185 App. Div. 906, 171 N. Y. Supp. 1085. In that case the court found as a fact that the drafts were left at the bank for collection only; that the deposit slip had attached thereto memoranda to the effect that the drafts were simply received for collection. In this case the proceeds of the drafts were checked out, and the form of deposit slip having words of reservation was not in fact used. No reservation appears on the deposit slip that was used when the drafts were discounted, to imply that they were for collection.

In American Trust & Savings Bank v. Austin, 25 Misc. Rep. 454, 55 N. Y. Supp. 561, affirmed 47 App. Div. 635, 62 N. Y. Supp. 1131, it was held in a similar case that, after "the bank had discounted the drafts and * * * passed their avails to the vendor's credit, it was entitled to recover from the proceeds" of the merchandise covered by the bills of lading "the amount of the drafts." And in speaking of a rule of the bank that, in receiving drafts, it was to act only as agent for the depositor, Judge Hiscock said the rule applied only as between the bank and its customer, and did not constitute the bank a mere agent of the vendor as against an attaching creditor.

The plaintiff in this case, it is true, could have charged the amounts of the drafts back to the drawer, upon the refusal of the drawee to accept or pay the same, but it was not obliged to adopt such method of repayment of the advance. Upon discounting the drafts and receiving the bills of lading, it had security for repayment in the way of a special property in the corn and the right to possess itself thereof. Indeed, the legal title passed to it, and operated to change possession of the grain from the original owner. Commercial Bank of Keokuk v. Pfeiffer et al., 108 N. Y. 242, 15 N. E. 311. In the federal courts the rule as to delivery of discounted drafts and bills of lading to a bank making advances to the drawee is substantially the same. See Dows v. National Exchange Bank of Milwaukee, 91 U. S. 618, 23 L. Ed. 214; Means v. Bank of Randall, 146 U. S. 620, 13 Sup. Ct. 186, 36 L. Ed. 1107.

[5] In the state of Ohio, where the bill of exchange was drawn and discounted, it has been held that a bank discounting the drafts,

even though the drawer has overdrawn his account, becomes a holder of the drafts for a valuable consideration. First National Bank of Parkersburg v. Crawford, 13 Ohio Dec. 807. See, also, General Code of Ohio, § 8193 et seq.

[6, 7] The Buffalo Grain Company in whose interest the writ of attachment issued, had no title to the grain or prior right thereto, and the defendant's seizure under the judgment was tantamount to its conversion, and he is liable for the reasonable value thereof. It is true that Horton was indebted to the bank in June, 1918, in a large amount of money over and above the amount of the draft, which was subsequently secured by the promissory note of his mother, and that he transferred to her his real property, valued at $20,000, and that he thereafter made partial payments upon the note given by his mother to the plaintiff to secure his indebtedness, and that the plaintiff by the transaction "is better off than it was when the drafts were credited"; yet such arrangement by Horton and his mother to secure the bank for their loans cannot be considered to nullify the right of possession of the grain given the bank by the transfer of the drafts and the bills of lading in issue.

Inasmuch as this court is of the opinion that the plaintiff had a special property in the corn, the objection, that the action for conversion was not a proper remedy, is not maintainable. The corn was sold by the defendant; he receiving, after paying a lien thereon of $1,-220.17 and other expenses, the sum of $9,211.56, which has been retained by him awaiting the termination of this trial. Although the plaintiff claims the value of the corn was $12,617.14 at the time of its conversion, I think that its public sale with a number of bidders in attendance is fairly indicative of its reasonable market value at Buffalo.

A decree may be entered, with costs, for the amount realized at the sale, less the fees, liens, and expenses.