## Samuel G. McCausland et al.

### v.

## The Wheeler Savings Bank.

*Commission Merchants—Draft—Promise to Accept—Shipments of Live Stock.*

1. A consignor may always direct as to the disposition of the net proceeds of a consignment.

2. If a consignee takes a consignment with knowledge that a draft has been drawn against it, he can not retain the consignment or its proceeds, and repudiate the draft.

3. If commission merchants are notified by a shipper that a draft in favor of a third person is to be paid out of the proceeds of goods shipped, such notification in connection with the draft amounts to an appropriation of the proceeds to the payment of such draft.

[Opinion filed December 7, 1891.]

Appeal from the Circuit Court of Cook County; the Hon. George Driggs, Judge, presiding.

Appellants were parties doing business as live stock commission merchants at the Union Stock Yards at Chicago; appellee is a banker at Brookfield, Missouri.

One F. M. Harrison in the latter part of 1887 went from Chicago to Brookfield and began to purchase stock and ship it to appellants. Before going he told appellants that he had $200 in cash and that he wished to buy stock and ship to them for sale, and wished to know if they would honor his draft for $2,000. They told him they would.

Harrison went to the bank, met A. J. Wheeler, its president, who knew him, and said to Wheeler that he wanted $2,000 with which to pay for stock and asked him to ascertain if appellants would pay his draft on them for that amount.

December 2, 1887, Wheeler telegraphed to appellants and they replied that they would pay Harrison's draft for $2,000. Harrison thereupon drew his draft on appellants for $2,000 and the bank gave him the money thereon. The draft was duly honored. A. C. Arnold, the son-in-law of Harrison and an employe of appellants, was at Brookfield in the spring of 1888 and told Harrison that he had made arrangements with appellee to pay any drafts that he, Harrison, "thought he could do any good with the money in buying stock." Arnold at the same time drew on appellants, through appellee, for some $6,000, and gave Harrison the money, which he paid for stock. Arnold introduced one party to appellants as his partner and told appellee that at any time Harrison wanted two or three thousand dollars to let him have it and he would see it was all right. Thereafter from time to time Harrison made drafts on appellants and got them discounted by appellee. His manner of doing business seems to have been to pay a little money on the stock when he purchased it, the balance when it was delivered. When he found out the amount he was going to ship he would go to appellee, make a draft on appellants and on it get the amount needed to pay for the stock. In a number of instances he obtained from appellee money with which to go out and purchase stock without making any draft on appellants.

Appellee did not take a bill of lading with any of the drafts,

and they were discounted by it before the cattle were actually shipped.   Appellee understood that Harrison was buying and shipping stock to appellants and that all the money it let him have was for such purpose.

Harrison, upon cards sent to him by appellants, represented himself as their Western agent.   A. C. Arnold's name was on their card as "Special."   He was, however, only an employe of appellants, receiving a salary and a half commission on his trade.

December 27, 1888, Harrison having told appellee that he would soon want money enough to handle six car loads of stock, appellee thinking this would require some $6,000, wrote to appellants as follows:

"BROOKFIELD, Mo., Dec. 27th, 1888.

McCausland, Hoag & Co., Chicago, Ill.

*Gentlemen :*   We have now, for a year or more, furnished currency to Mr. F. M. Harrison, of Bucklin, Mo., upon his individual check.   Now he informs us that he will soon want money enough to handle six car loads of stock.   Now, notwithstanding all our business transactions with Mr. Harrison, which have been perfectly satisfactory, yet we feel a delicacy in furnishing so great an amount without some security or assurance of pay.   Now, gentlemen, the point is, will you protect his checks made on you?

Yours, etc.

R. J. WHEELER, Pres."

Mr. Wheeler says he wrote this because he understood that the arrangement made by Arnold was only as to drafts for two or three thousand dollars.

He received the following reply:

"CHICAGO, ILL., 12/29th, 1888.

R. J. WHEELER, President Wheeler Savings Bank, Brookfield, Mo.

*Dear Sir:*   Yours at hand.   We would not obligate ourselves to pay any man's drafts for an indefinite amount.

Yours, etc.

McCAUSLAND, HOAG & Co."

The amount realized by appellants for the stock shipped to

them by Harrison was not always enough to pay his draft and Harrison's account with them thus became overdrawn, until on December 20, 1888, it was overdrawn $1,719.29.

December 24, 1888, Harrison drew on appellants for $1,337.33 in payment for two car loads of stock shipped to them; appellee discounted this draft for Harrison and on December 27, 1888, Harrison drew on appellants for $402 in payment of the amount for which he had given parties checks on appellee for stock, which checks had not been presented to the bank for payment at the time the draft for these two car loads was made. The money to pay for the stock represented by these two drafts was furnished by appellee and the stock was shipped to appellant. The stock was received by appellants and sold by them, and on December 28th, out of the proceeds, they credited Harrison's account with $460.27. On December 29th, out of the proceeds of this stock last shipped, they credited Harrison's account with $907.86; the cattle were received the day they were sold. Appellants refused to accept or pay these drafts, which were the last of some twenty made by Harrison upon them and discounted by appellee. December 26th Harrison wrote appellants: " I ship you one. load of cattle to-night. All the hogs failed to get in, but will be in to-morrow. Will ship them as soon as they come in. I drawed draft on the house $1,337. Started the stock to get in by the time the stock would."

Mr. McCausland testified that in the general course of events he must have seen this letter on the 28th or 29th of December, the day after or the day it arrived. Appellants honored all of Harrison's drafts up to the one of December 24th. They knew that he had shipped stock at that time, and one of the appellants testifies that he thinks they knew that Harrison had made a draft against it. Harrison had always made drafts on appellants for every consignment of stock, and when they got the draft of December 24th they knew it was against the stock. They understood that Harrison was buying stock, and that when he wanted to pay for it, he went to appellee and made a draft on them for the amount and then shipped the stock to them.

Suit being brought upon these two drafts, appellee, on the 17th of July, 1891, recovered judgment for $1,537.83.

Mr. Joseph B. Leake, for appellants.

Messrs. Cratty Bros., for appellee.

Waterman, P. J.   If a consignee takes a consignment with, knowledge that a draft has been drawn against it, he can not retain the consignment or its proceeds and repudiate the draft. Hall v. Bank, 133 Ill. 234; Jones on Liens, Sec. 61.

Whether appellants took the consignment of the last two cars of stock shipped by Harrison with notice that a draft or drafts had been drawn against such shipments, was a question of fact, which has been found against appellants.

From the entire course of dealing appellants had (when they received the last two cars) reason to believe that drafts, discounted by appellee, had been drawn against these shipments, and Mr. Hoag of their firm testifies that he thinks they knew that Harrison had made a draft against them.

The precise hour at which the letter written by Harrison December 26th, in which he stated that he had drawn on them for $1,337 and had started the stock to get in by the time the "stock" did, was received, is not shown, but appellants do not testify that when they received these consignments they had no notice that any draft had been made against them. The expression in this letter, " Had started the stock to get in by the time the stock did," they can not have failed, and do not claim to have understood as meaning otherwise than "had started the stock to get in by the time the draft did." A consignor may always direct as to the disposition of the net proceeds of a consignment. If appellants did not care to obey the directions of Harrison as to the disposition of the proceeds of the cattle, they should have declined to receive them; if, having notice that Harrison had made a draft against the proceeds of the shipments, they saw fit to receive and sell the cattle, then they became bound to apply the proceeds to the payment of the draft. That they had such notice the

Circuit Court has found and we think the evidence warranted its conclusion.

The question is not so much whether the bank discounted the drafts on the faith of the shipments, as whether Harrison, the consignor, by the drafts appropriated the proceeds of the shipments to their payment, and whether appellants had notice when they received the stock of such appropriation. If appellants were notified by Harrison when they received the shipments that drafts in favor of a third person were to be paid out of the proceeds of the stock, then such notification in connection with the drafts amounted to an appropriation of the proceeds to the payment of such drafts. Jones on Liens, Sec. 61.

We see no sufficient reason for interfering with the finding of the court below and its judgment must be affirmed.

*Judgment affirmed.*