## MUMFORD et al. v. HARTFORD ACCIDENT & INDEMNITY CO.

No. 4115.    Decided July 18, 1924.    (228 Pac. 206.)

1. PLEADING—DEFENDANT HELD NOT ENTITLED TO COMPLAIN OF AMENDMENT TO COMPLAINT. Defendant's counsel who were served with a copy of the amended complaint (amended after court rendered its memorandum decision) and filed their answer without objection, *held* not entitled to complain of the amendment as having been allowed without notice and in violation of Comp. Laws 1917, § 6619.

2. PLEADING—AMENDED COMPLAINT HELD NOT TO SET UP NEW CAUSE OF ACTION. Where first complaint alleged a cause of action on a live stock company's bond, for failure to account to plaintiffs for sale of cattle made to the company, and the amended complaint alleged failure to account for sales made to other parties for shipment to the company under such circumstances as rendered the company liable to plaintiffs therefor, *held*, that amended complaint did not set up a new cause of action.[1]

3. FACTORS—EVIDENCE HELD TO SUSTAIN FINDINGS LIVE STOCK COMPANY CONSENTED TO DRAFTS ON IT FOR PURCHASE PRICE OF CATTLE SOLD TO PARTNERSHIP AND SHIPPED TO COMPANY. Evidence *held* to sustain court's findings that a partnership, buy-

---

[1] *Detroit Vapor Stove Co.* v. *Weeter Lumber Co.*, 61 Utah 503, 215 Pac. 995.

See 3 C. J. § .720; 4 C. J. § 2921; 20 C. J. § 4; 25 C. J. §§ 65, 164; 31 Cyc. pp. 415, 451, 752; 32 Cyc. p. 81 (1926 Anno.).

Appeal from Second District

ing cattle and shipping to a live stock commission company to be resold on their account, issued drafts to plaintiffs for cattle sold to the partnership, in accordance with the usual custom, with the commission company's knowledge and consent, and that it knew when it sold the cattle and converted the proceeds that the drafts were unpaid and outstanding.

4. ELECTION OF REMEDIES—PLAINTIFFS, HAVING ACTIONS AGAINST TWO PARTIES, HELD ENTITLED TO ELECT TO SUE DEFENDANT. Plaintiffs, who in addition to having a right to sue buyers of cattle, had the primary right to sue surety of commission company to which they were shipped, *held* entitled to elect to sue the latter.

5. FACTORS—FACTOR, TAKING CATTLE WITH KNOWLEDGE OF UNPAID DRAFT AGAINST IT FOR PURCHASE PRICE, AND REPUDIATING DRAFT, HELD LIABLE TO OWNERS FOR PURCHASE PRICE. Where a live stock commission company, as factor, took from its principal, a copartnership, a consignment of cattle with knowledge that the copartnership had drawn drafts against it in favor of sellers of the cattle for purchase price thereof, pursuant to the usual custom of business, the commission company for refusing to honor such drafts, and for converting to its own use the property of a resale of the cattle, *held* liable to the sellers.

6. PRINCIPAL AND SURETY—LIVE STOCK COMPANY'S FAILURE TO PAY DRAFT FOR PURCHASE PRICE OF CATTLE HELD FAILURE TO ACCOUNT WITHIN BOND. Failure of a live stock commission company to honor drafts issued to plaintiffs in payment for cattle by parties shipping to the company, *held* a failure to account to person damaged within live stock company's bond.

7. APPEAL AND ERROR—VARIANCE BETWEEN COMPLAINT AND COURT'S FINDING DISREGARDED IN ABSENCE OF OBJECTION BELOW. A variance between a complaint and the court's finding will be held immaterial, and the defect in the complaint will be disregarded on appeal where objection was not urged below.

8. APPEAL AND ERROR—VARIANCE HELD NOT TO JUSTIFY REVERSAL. Where the complaint alleged drafts were drawn on the live stock company with its knowledge, and the court found that such drafts were drawn with the knowledge "and consent" of the live stock company, the variance *held* not to justify a reversal.

Appeal from District Court, Second District, Weber County; *J. N. Kimball,* Judge.

Action by T. M. Mumford and another, as partners, against the Hartford Accident & Indemnity Company. Judgment for plaintiffs, and defendant appeals.

AFFIRMED.

*Young, Boyle & Moyle,* of Salt Lake City, for appellant.

*Jos. E. Evans* and *Charles R. Hollingsworth,* both of Ogden, for respondents.

THURMAN, J.

Plaintiffs sued defendant for damages on an indemnity bond in which the Union Live Stock Commission Company of Ogden, Utah, was principal and the defendant herein was surety. The bond is attached to and made a part of the complaint, and contains the following provisions material to the issues involved:

"Whereas, the said principal having an office at the Ogden Live Stock Exchange, Ogden, Utah, is engaged in the Live Stock Commission business, buying and selling live stock for others on commission, according to the rules and regulations of the Ogden Live Stock Exchange.

"Now, therefore, the condition of this obligation is such that if the said principal shall faithfully account for all proceeds of sales made by him, and for all funds furnished him for purchases of live stock, and shall pay for all live stock purchased by him, according to the rules and regulations of the Ogden Live Stock Exchange, then this obligation to be and become null and void; otherwise to remain in full force and effect.

"It is expressly agreed as follows:

"1. The persons damaged by the breach of any conditions hereinbefore set out may maintain an action on this bond in their own name to recover damages, first obtaining written consent of the obligee to bring suit or the obligee first obtaining written consent of such person may maintain the action in the obligee's name, the recovery to be made for the use of the person damaged; that the obligors herein, both principal and surety, hereby waive every defense, if any there might be, based upon the fact that the persons damaged or in whose name the suit shall be brought are not party or privy to this bond.

"2. The term 'persons' as used in this instrument shall be construed to mean and include both singular and plural and corporations, copartnerships, individuals, and the successors of corporations, and the heirs, executors, administrators and assigns of individuals.

"3. The acts of authorized agents· or representatives of said principal, or persons whom said principal shall knowingly permit to represent themselves as acting for said principal shall be taken and construed to be the acts of the said principal and to be within the protection of this bond to the same extent and in the same manner as if they were the personal acts of said principal."

The amended complaint, in substance, alleges the partnership of plaintiffs, the corporate capacity of defendant and the Union Live Stock Commission Company, hereinafter called commission, and that the bond was executed by defendant February 14, 1921. The complaint then alleges that on February 9, 1923, at Paris, Idaho, and Border, Wyo., the plaintiff sold and delivered to the commission 56 head of cattle of the reasonable value of $3,308, and that the commission promised to pay said sum, and, in pursuance thereof, by and through its authorized agents, on said date, made and delivered to plaintiffs a certain sight draft and bill of exchange in words and figures as follows:

"The Commercial National Bank.
                                "Ogden, Utah, Feb. 9, 1923.
"At sight pay to the order of Mumford Bros. $3,308.00 (thirty-three hundred eight and no/100 dollars) with exchange value received and charge to the account of
                                "Beckstead & Hillman,
                                        "By Percy.
"To Union Live Stock Com. Co., 56 Cattle, Ogden, Utah."

It is further alleged in the complaint that on February 14, 1923, the draft was duly presented to the commission for acceptance; that payment thereof was refused; and that no part of said sum has been paid. The complaint then alleges the giving of notice of the damage claimed, as required by the terms of the bond.

For a second cause of action plaintiffs allege, in the same form, a sale and delivery made to the commission, on the same date, by one G. H. Hall, of 28 head of cattle, of the reasonable value of $1,517.50, and the promise of the com-

mission by and through its agents to pay for the same, and
the issuance and delivery to Hall of a draft for said sum in
the same form as the draft to Mumford Bros., except that
the name of Hall appears at the bottom of the draft. Pres-
entation of said draft to the commission on the 23d day of
February, 1923, by Hall, and the refusal to pay the same,
were duly alleged, and notice of claim for damages, as re-
quired by the bond. The claim of Hall was duly assigned to
plaintiffs.

A third cause of action was also alleged, but it is not in-
volved in this appeal in view of the findings and judgment of
the court.

Plaintiffs pray judgment for the aggregate amount of the
two drafts and for attorney's fees in the sum of $750, and
costs.

The defendant answering the complaint denied that plain-
tiffs sold the cattle to the commission through or by its agents
or otherwise.

The case was tried to the court without a jury. A memo-
randum decision was rendered by the court in which it di-
rected findings and judgment in favor of plaintiffs.

The court, instead of finding that Beckstead & Hillman
were agents of the commission in the purchase of the cattle,
found that the transaction was in accordance with the cus-
tomary course of trade between Beckstead & Hillman and
the commission and that the drafts in question were issued
and delivered by Beckstead & Hillman with the commission's
knowledge and consent.

The plaintiffs, by leave of court, filed an amended com-
plaint to conform to the proof as found by the court. A
copy of the complaint, as amended was served upon defend-
ant's counsel who filed and served answer thereto in which
the material allegations of the complaint were denied.

The court entered findings in accordance with its memo-
randum decision among which findings are the following
which are material in view of the issues presented:

"3. That from and after about December 10, 1922, and at all
times hereinafter mentioned, Percy Beckstead and J. W. Hillman

were copartners doing business under the name and style of Beck-
stead & Hillman, and engaged in buying and shipping cattle to
said Union Live Stock Commission Company to be sold on their
account, and in paying for cattle so shipped to them, with the
knowledge and consent of said Union Live Stock Commission
Company, paid the owners of cattle purchased by drafts drawn
upon it in favor of the respective owners and sellers of said cat-
tle for the purchase price thereof, and that all purchases and
shipments of cattle by said Beckstead & Hillman to said Union
Live Stock Commission Company were paid for in the manner
aforesaid; that on February 9, 1923, at Paris, Idaho, and Border,
Wyoming, the plaintiffs sold and delivered to said Beckstead &
Hillman 56 head of cattle of the reasonable value of $3,308.00, and
that said Beckstead & Hillman, at said time and place, and in con-
formity with the custom and course of trade between them and
said Union Livestock Commission Company as aforesaid, gave
said plaintiffs in payment for said cattle a certain sight draft or
bill of exchange in the words and figures, to wit:
                    " 'The Commercial National Bank.
                              " 'Ogden, Utah, Feb. 9, 1923.
    " 'At sight pay to the order of Mumford Bros. $3,308.00 (Thirty-
three Hundred Eight and no/100 Dollars), with exchange value
received and charge to the account of
                              " 'Beckstead & Hillman,
                                     " 'By Percy.
" 'To Union Livestock Com. Co., 56 cattle, Ogden, Utah.'
    "That said cattle were loaded on board cars at said Border,
Wyoming, by said Beckstead & Hillman and consigned to the said
Union Live Stock Commission Company to be sold by it on com-
mission for the account of said Beckstead & Hillman; that said
company received said cattle at Ogden, Utah, on or about February
11, 1923, and sold them on or about February 12, 1923, at and for
a sum netting in excess of the sum specified in said draft, which
sum was then and there received by said company; that said
Union Live Stock Commission Company, at the time it received
said cattle, and at the time it sold the same, and at the time it
received the payment from the purchaser thereof knew that a draft
or bill of exchange had been drawn upon it by said Beckstead &
Hillman for the purchase price of said cattle, and that said draft
was outstanding and unpaid.
    "4. That thereafter, to wit, on or about February 14, 1923,
said draft or bill of exchange, of which the foregoing is a copy,
was duly presented to the said Union Live Stock Commission
Company for acceptance and payment, and that said company re-
fused to accept or pay the same and refused to account to the
plaintiffs for the proceeds of said sale of said cattle, and converted

the said proceeds to its own use by crediting the same to the account of said Beckstead & Hillman with it, and applied the same in payment of a debit balance owing to it by said Beckstead & Hillman; and that the said sum of $3,308.00 has not been paid by any person in whole or in part to the plaintiffs."

The court made similar findings as to the matters alleged in plaintiffs' second cause of action.

Judgment was entered for plaintiffs, and defendant appeals.

Among the error assigned appellant charges error in permitting plaintiffs to amend their complaint after the court rendered its memorandum decision. Appellant contends that the amendment was allowed without notice and in violation of Comp. Laws Utah 1917, § 6619. As before stated, however, appellant's counsel were served with a copy of the amended complaint and filed their answer thereto without objection. It does not appear that they suggested that a new issue had been raised or that they desired to offer further evidence in view of the matters alleged. If seasonable objection had been made and prejudice to appellant's substantial rights had been suggested to the trial court, and the court had denied relief, there would be far more force in counsel's contention. As it is, it does not appear that appellant suggested to the trial court that it would be in any manner prejudiced by permitting the complaint to be amended.

Appellant makes the further contention that the amended complaint alleged a cause of action entirely different from that alleged in the first amended complaint, and that such an amendment should not have been allowed. Appellant cites *Detroit Vapor Stove Co.* v. *Weeter Lumber Co.,* 61 Utah, 503, 215 Pac. 995, and the following quotation therein from Bliss on Code Pleadings:

"The power of amendment of pleadings is great under the Code. The real limitation seems to be that the amendment shall not bring in a new cause of action.

It is doubtful, in the instant case, if the amendment brought in a new cause of action. It is more accu-

rate to say it is a different description of the same cause of action.

Plaintiffs sued defendant because the commission failed to account to plaintiffs for certain sales of cattle made to the commission. By their amended complaint plaintiffs sued defendant because the commission failed to account for sales made to other parties for shipment to the commission under such circumstances as rendered the commission liable to account to plaintiffs therefor. In both instances the foundation of the action and grievance complained of is the failure of the commission to account to the plaintiffs for the sale of the cattle. We do not think there was such a departure as justified this court in holding that a new cause of action was brought in by the amendment. We are not now passing upon the validity of the complaint, but merely upon the question whether, under all the circumstances of the case, it was error to allow plaintiffs to file their amended complaint. For the reasons stated we are of opinion it was not error.

Although appellant did not demur to the complaint, as amended, it, nevertheless, assails it as insufficient and fatally defective. Whether or not it states a cause of action against appellant depends entirely upon the law applicable to the merits of the case. We prefer, therefore, to consider the merits first, for in so doing we will thereby determine the sufficiency of the complaint.

There is substantial evidence in the record to show that on or about November 10, 1922, Beckstead & Hillman, who signed the drafts heretofore referred to, entered into a copartnership in buying and shipping cattle to the commission, and it appears to have been their custom to draw drafts upon the commission for the purchose price of the cattle, which drafts were paid on presentation. The drafts were made in favor of the persons from whom they purchased the cattle and specified the number and kind of cattle purchased. With the exception of a few drafts for small amounts drawn on the commission for family and incidental expenses by Beckstead & Hillman, all of the drafts drawn by them were made in favor of the persons from whom they purchased the cat-

tle. The business carried on in this manner between Beck-
stead & Hillman and the commission was somewhat extensive.
Between November 10, 1922, and the date of the transaction
complained of in the complaint, it amounted to $40,000 or
$50,000. In many of the drafts the name of the commission
was printed in the draft; in others it was written. It appears
that Hillman had been carrying on the same kind of business
with the commission before Beckstead became his partner.

On February 5, 1923, Beckstead entered into negotiations
with Mumford for the purchase of the cattle referred to in
plaintiff's first cause of action. At that time Mumford gave
Beckstead an option to purchase the cattle, and received for
said option a draft drawn by Beckstead in words and figures,
to wit:

"The Commercial National Bank,
"Ogden, Utah, Feb. 5, 1923.

"At sight pay to the order of T. M. Mumford $50.00 (fifty and
no/100 dollars) value received, and charge to account of

"Beckstead & Hillman,
"By Percy.

"To Union Live Stock Co., Option 1 car steers, at $67.50."

On February 9, 1923, Beckstead having concluded to take
up the option issued and delivered to Mumford the draft,
hereinbefore quoted, for the sum of $3,308. Beckstead con-
signed the cattle to the commission at Los Angeles, "feed at
Ogden." The cattle were stopped at Ogden by the commis-
sion and were there sold on February 12th by Mr. Rogers,
the commission's representative, and the price received was
carried to the account of Beckstead & Hillman. The Hall
cattle referred to in plaintiff's second cause of action were
purchased by Beckstead and draft issued and delivered by
him to Hall, and payment refused, in the same manner as in
the deal with Mumford. The cattle were shipped with the
Mumford cattle, sold by the commission at the same time
and the proceeds carried to the account of Beckstead & Hill-
man. It appears that the account of Beckstead & Hillman
with the commission was at the time overdrawn in an amount
exceeding the proceeds of the sale. The cattle, however, sold
for a sum in excess of the aggregate amount of the Mumford

and Hall drafts. Beckstead accompanied the shipment of cattle to Ogden, arriving there on February 11, and on that day had a conversation with Mr. Rogers, the commission's representative. Referring to the Mumford and Hall cattle, which had just arrived, Rogers asked Beckstead whose cattle they were. Beckstead told him the Holsteins and Jerseys were Mr. Hall's and the others were Mumford's. They had further conversation about the cost of the cattle, also the selling price, when they were being sold. The drafts did not reach the Ogden bank until February 13, on account of Sunday and a holiday intervening. On that day they were presented to the commission for payment and the bank was requested to present them next day, with the suggestion that probably they would be paid. On presentation the next day payment was refused.

Such, in brief, is a summary of the facts deducible from the evidence in support of the findings of the court that the transactions with respect to the purchase price of the cattle and issuing drafts therefor on the commission were had with its knowledge and consent, and that it knew the drafts were unpaid and outstanding at the time it sold the cattle and converted the proceeds.

Three questions material to a decision of the case are presented for our consideration: (1) Is it fairly deducible from the evidence that the commission consented and had knowledge of the transaction, as found by the court? (2) Assuming that the commission had knowledge and consented thereto, does the transaction show a cause of action in favor of the plaintiffs against the commission? (3) Assuming an affirmative answer to the last question, does it necessarily follow that there is likewise a cause of action against the defendant on its bond?

The first question, in the opinion of the writer, is easily determined. The whole course of business as above outlined between Beckstead & Hillman and the commission, together with the express information given to the commission before it sold the cattle that they were the cattle of Mumford and Hall, renders it practically conclusive that the commission

had knowledge, as found by the court, and consented thereto. It must have had knowledge that the purchase of the Mumford and Hall cattle had been made in the customary way by drawing drafts on the commission in favor of the owner or seller. Especially is this true in the case at bar as the drafts were drawn by Beckstead, for the commission knew that Beckstead had no funds of his own with which to pay for the cattle, and that his habit was to draw a draft on the commission against each consignment. Furthermore, in the instant case it is clear the commission had knowledge because it knew a draft had been drawn by Beckstead for $50 in favor of Mumford, on account of the option for a carload of cattle and that it had paid the draft on presentation. It undoubtedly anticipated the arrival of a draft for the balance of the purchase price. When the cattle arrived a few days later and the company was informed that they were the cattle of Mumford and Hall the presumption is strong, if not conclusive, that the commission knew there were drafts unpaid and outstanding in favor of Mumford and Hall. Besides this, it is somewhat significant that Rogers, the representative of the commission, instead of assuming that the cattle belonged to Beckstead & Hillman, the consignors, should be inquiring of Beckstead as to whose cattle they were. The inquiry thus made is strongly suggestive of the fact that the commission anticipated that drafts in favor of the owners would be presented in due course. We are of opinion that there was ample evidence to sustain the findings of the court.

The next question is: Do the facts found by the court show that plaintiffs have a cause of action against the commission? Appellant's counsel strongly contends they do not. Their position seems to be that the commission did its business as factor with Beckstead & Hillman and not with the plaintiffs; that Beckstead & Hillman by purchase of the cattle and obtaining possession under the purchase became the owners thereof without lien incumbrance, and that the commission, as factor, discharged its whole duty when it sold the cattle and carried the amount of the proceeds to the ac-

count of Beckstead & Hillman. In short, its contention is
that it was under no obligation whatever to pay the Hall &
Mumford drafts or to account to plaintiffs in any manner
or form. Respondents contend to the contrary, and call our
attention to the following cases: *McCausland* v. *Wheeler
Savings Bank,* 43 Ill. App. 381; *Fisher* v. *Shenandoah First
Nat. Bank,* 37 Ill. App. 333; *Helm* v. *Meyer,* 30 La. Ann. 943;
*Lowery* v. *Steward,* 25 N. Y. 239, 82 Am. Dec. 346; *Urquhart*
v. *McIver,* 4 Johns. (N. Y.) 103; *Rochester Bank* v. *Jones,* 4
N. Y. 497, 55 Am. Dec. 290; *Citizens' Bank* v. *Adams* (C. C.)
84 Fed. 268; *Cordell* v. *Hall* (C. C.) 34 Fed. 866; *Hinrichs* v.
*Standard Trust & S. Bank* (C. C. A. N. Y.) 279 Fed. 382;
*Union Stock Yards Nat. Bank* v. *Moore,* 79 Fed. 705, 25 C. C.
A. 150; *Union Stock Yards Bank* v. *Gillispie,* 147 U. S. 411,
11 Sup. Ct. 118, 34 L. Ed. 724; *Clemmer* v. *Drovers' Nat.
Bank,* 157 Ill. 206, 41 N. E. 728.

In *McCausland* v. *Wheeler Savings Bank,* supra, the facts
were analogous in principle to the facts presented here. The
case turned upon the question whether appellants, who were
live stock commission merchants, and the consignees, had
knowledge of outstanding drafts against a consignment of
stock. At page 385 of the report the court says:

"If a consignee takes a consignment with knowledge that a
draft has been drawn against it, he cannot retain the consignment
or its proceeds and repudiate the draft. *Hall v. Bank,* 133 Ill. 234;
Jones on Liens, § 61.

"Whether appellants took the consignment of the last two cars
of stock shipped by Harrison with notice that a draft or drafts
had been drawn against such shipments, was a question of fact,
which has been found against appellants.

"From the entire course of dealing appellants had (when they
received the last two cars) reason to believe that drafts, dis-
counted by appellee, had been drawn against these shipments, and
Mr. Hoag of their firm testifies that he thinks they knew that
Harrison had made a draft against them."

To the same effect see *Fisher* v. *Shenandoah First Nat.
Bank,* supra, and *Means* v. *Bank of Randall,* 146 U. S. 620,
13 Sup. Ct. 186, 36 L. Ed. 1107, is within the principle.

*Cordell* v. *Hall,* supra, was a case in which a live stock
brokerage firm, consignee of several shipments of cattle, re-

fused payment of the last draft issued by the consignor and converted the proceeds of the sale to its own use, claiming a factor's lien on account of an old claim against the consignor. The consignor had paid for the cattle with money advanced for their purchase by the plaintiffs, who were then doing a banking business. The consignor issued drafts on the consignee payable to the bank, and the bank claimed the defendants had agreed to honor the drafts, and claimed further that the defendants knew that plaintiffs had furnished the money to purchase the cattle. Similar drafts had been paid before on presentation. The second and third paragraphs of the syllabus reflect the opinion of the cout:

"If the cattle were purchased by Farlow with money obtained from the plaintiffs with the agreement that the plaintiffs were to be paid for their advances on such cattle out of the proceeds of the same when sold by the defendants as Farlow's brokers, and that the defendants knew of such agreement between Farlow and the plaintiffs, then the defendants, as Farlow's brokers, had no right to apply any part of the proceeds of said cattle to the payment of the debt of Farlow to themselves, until the draft was fully paid.

"And such is the law, whether such knowledge on the part of the defendants was actual or constructive, the question being whether the defendants knew that Farlow had obtained advances from the plaintiffs upon the cattle, and had appropriated the proceeds of the cattle to the payment of those advances by the draft. If they had such knowledge, they had no right to appropriate these proceeds to the payment of their own debt against Farlow. Such knowledge might be derived expressly, or from the course of business between the parties theretofore, or from the defendants' knowledge of Farlow's financial ability, or other pregnant facts."

The case of *Union Stockyards Nat. Bank* v. *Moore et al.*, supra, in principle, sustains respondents' contention. The bank (appellant) had as a regular depositor a corporation engaged in business as a live stock commission agent and factor. It deposited all its money with the bank, and on the date in question had largely overdrawn its account. It received a large shipment of cattle for sale on commission, sold the cattle and deposited the proceeds as usual in the bank. The bank converted the proceeds to its own use by applying the same to the credit of the depositor upon its overdrawn

account. When the checks which had been issued by the commission agents to the appellees in payment for the cattle were presented to the bank, payment was refused. The court, in determining the issue presented, 79 Fed. at page 706 (25 C. C. A. 151) of the report, says:

"The right of the appellees to recover of the appellant the moneys claimed by the appellees in this suit depended upon the litigated questions of fact, whether the appellees were in equity the owners of the money claimed by them at the time the same was deposited by said company in said bank, and whether the officers of said bank, when it received such deposit, knew, or had reason to believe, that the deposit consisted of or contained moneys not belonging to said company, but to the appellees, or to others for whom the company was but the agent or factor. *Clemmer v. Bank* (Ill. Sup.) 41 N. E. 728; *Bank v. Gillespie*, 137 U. S. 411, 11 Sup. Ct. 118. The court found these facts in favor of the appellees, and, from a careful consideration of the evidence, we are satisfied with the correctness of such finding. The decree appealed from is affirmed."

In *Citizens' Bank of Tina* v. *Adams et al.*, supra, which was also a case in which the bank advanced money for the payment of cattle shipped to the consignee, the holding of the court and the rule applied is tersely stated in the syllabus:

"A bank advancing money to stockmen for the purchase of stock, with the understanding that, according to the previous course of business, the stock would be shipped to commission merchants, sold, and the proceeds placed to the credit of the bank, for its reimbursement, gives the bank a right to such proceeds as against the commission merchants, who are aware of the understanding and previous course of business, and they cannot appropriate such proceeds to the payment of a debt due them from the shippers."

In *Helm* v. *Meyer*, supra, while the court held that the case did not fall within the doctrine announced in the case above reviewed, it, nevertheless, at page 945, declared the following to be the correct rule:

"There can be no doubt of the correctness of the general proposition that a consignee who accepts a consignment, with the advice and notice that the consignor had drawn on him for a stated amount against the goods consigned, impliedly promises to accept and pay the draft, and on refusal may be sued as for breach of contract."

The rule is recognized in 25 C. J., at page 374. The text

also states the conditions under which a factor may credit the proceeds upon his principal's indebtedness. The text reads:

"If the factor has notice that the principal has drawn on him in anticipation of the avails of the consignment the factor becomes bound by accepting the consignment to pay the bill and in case of nonpayment is liable to his principal for the resulting damages. But where the factor has made advances on the goods consigned, he is not bound to accept and pay a draft drawn on him by the principal, in favor of a third person, until such advances are repaid."

It is unnecessary to quote further from the authorities. Appellant refers us to no cases announcing a contrary doctrine. The rule appears to be just and equitable.

Appellant's position is extremely technical. Because Beckstead & Hillman, nominlly at least, were principals in dealing with the commission as factor, the contention is that the factor had the right to apply the proceeds of the sale to the credit of Beckstead & Hillman on their overdrawn account. This would, undoubtedly, be a correct position if the commission had not known that there were drafts outstanding against the consignment issued for the payment of the cattle. We have found from all the circumstances of the case that the court's finding upon that point is amply sustained by the evidence. It seems, therefore, that while the contention of appellant's counsel, as to the effect that should be given to the relationship between the commission and Beckstead & Hillman, is both able and ingenious, it follows the shadow rather than the substance of the transaction, and, if approved and adopted by this court, would result in the rankest kind of injustice.

The further technical contention is made that there is no evidence that plaintiffs were damaged, because they had their remedy against Beckstead & Hillman. To this it may be answered that if they had a right to sue the defendant surety at all that right was a primary right, and the plaintiffs had the right of election as to whom they would sue.

In view of all the circumstances of the case we are of opinion plaintiffs have a cause of action against the com-

mission for refusal to honor the drafts in question and for converting to its own use money which had been appropriated for the payment of the cattle.

The third question is: Have plaintiffs a cause of action against the defendant on its bond? It would seem to follow as a necessary corollary from the conclusions already arrived at by the court that plaintiffs have such cause of action. The failure of the commission to honor the drafts issued to plaintiffs for the payment of the cattle was a failure to account to the persons damaged, within both the spirit and letter of the bond.

Appellants again, with an ingenuity equalled only by the untenability of its contention, insists that if the plaintiffs had any cause of action against the commission it was a case in tort for conversion for which the surety cannot be held accountable. This also ignores the substance and follows the shadow, and that, too, in a jurisdiction where forms of action are abolished.

If our answers are correct as to the first and second questions, already reviewed, it is only necessary to refer the reader to the provisions of the bond hereinbefore quoted to demonstrate the proposition that the facts bring the case clearly within the terms of the bond.

Appellant's brief devotes many pages to a discussion of vendor's and factor's liens, to the effect that vendors lose their liens when they part with possession and factors have liens upon proceeds in their hands for unpaid balances due them from their principals.

Neither the discussion of counsel nor the authorities cited have any application to the instant case.

Appellant also complains that the court failed to find that the commission only honored Beckstead & Hillman's drafts when their balance was sufficiently large to cover the same. In this contention appellant overlooks the fact that the commission honored the option draft for $50, when the record shows the account of Beckstead & Hillman was overdrawn many thousands of dollars. There is a significance attached to the honoring of the $50 draft which at least should receive

a passing notice. If the commission had dishonored the draft, which it might have done in view of the condition of Beckstead & Hillman's account, plaintiffs would have refused to ship the cattle and consequently would have sustained no damage. If it was the usual custom of the commission to honor the drafts of Beckstead & Hillman only when there was a balance to their credit, then the honoring of the draft for $50, under the circumstances, can only be accounted for either as an oversight on the part of the commission or as a trick by which the plaintiffs would be induced to accept a draft from Beckstead & Hillman for the balance of the purchase price. To say the least, it is a circumstance which from one point of view has many of the earmarks of a deliberate fraud. But, as fraud is not an element essential to a cause of action, we refrain from further comment on that feature of the case.

Many other propositions have been discussed by appellant, all of which have been given consideration. It is contended that there is a variance between the complaint, as amended, and the findings of the court, in that the court found the drafts were drawn with the knowledge *and consent* of the commission, while the complaint only alleges they were drawn with the *knowledge* of the commission.

We have already arrived at the conclusion that the facts found by the court are sustained by the evidence, and while we do not concede that there is a material variance, in view of authorities heretofore referred to, yet, even if the complaint were defective in the respect mentioned,    **7, 8** there being no objection in the court below, the defect in this court should be held immaterial and be disregarded. 31 Cyc. 451. We would not feel justified in reversing the judgment on this ground alone.

The court is of opinion that there is no reversible error in the record.

The judgment is affirmed, at appellant's cost.

WEBER, C. J., and GIDEON, FRICK, and CHERRY, JJ., concur.